57 A.3d 1068

**JAI MEDICAL SYSTEMS MANAGED CARE ORGANIZATION, INC.**

v.

**Wilhelmina BRADFORD.**

**No. 0734, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Dec. 20, 2012.

David J. McManus, Jr. (Siobhan R. Keenan, Baxter, Baker, Sidle, Conn & Jones, PA, on the brief), Baltimore, MD, for Appellant.

Brian J. Murphy, Baltimore, MD (Mark S. Cohen, Towson, MD, on the brief), for Appellee.

Panel: WOODWARD, WRIGHT, JAMES R. EYLER, (Retired, Specially Assigned), JJ.

WRIGHT, J.

This appeal arises from a jury verdict in the Circuit Court for Baltimore City in favor of appellee, Wilhelmina Bradford, finding appellant, JAI Medical Systems Managed Care Organization, Inc. ("JAI"), vicariously liable for the negligent medical care of a provider in its network. Prior to trial, JAI filed a motion for summary judgment on the grounds that Dr. Steven W. Bennett was not an employee or agent of JAI, which was denied. At the close of Bradford's case, JAI moved for judgment as a matter of law based on insufficient evidence of agency, and the trial court deferred ruling on the motion.

JAI renewed its motion at the close of all evidence and the trial court denied the motion. The jury found in favor of Bradford and awarded damages of $3,064,000. JAI filed post-trial motions for Judgment Notwithstanding the Verdict ("JNOV"), a new trial, and remittitur under Md.Code (1973, 2006 Repl. Vol.) § 3–2A–09(b)(1)(ii) of the Courts and Judicial Proceedings Article. The trial court denied the motions for JNOV and a new trial and granted the motion for remittitur. Judgment was entered against JAI for $714,000, and JAI filed this timely appeal.

### Questions Presented

JAI asks us to determine: [1]

1) Whether the trial court erred as a matter of law when it determined that the doctrine of vicarious liability was so broad as to permit a managed care organization to be held liable for the actions of a physician in its provider network under a theory of apparent agency.

2) Whether the trial court erred when it determined that the Plaintiff had presented sufficient evidence that the relationship between [JAI] and Dr. Bennett was other than that of a managed care organization and a network provider member and allowed the jury to determine that [JAI] was vicariously liable for the actions of Dr. Bennett as its apparent agent.

Finding that the trial court erred in submitting the issue of apparent authority to the jury and denying JAI's motions for judgment, we reverse the circuit court's judgment.

### Facts and Procedural History

JAI is a managed care organization ("MCO") formed in 1996 to provide health insurance to Medicaid patients. Medicaid recipients enroll in a MCO through the Maryland Department

---

1. Bradford presented a third question:
 3. If the issue is preserved, does public policy play any part in this Court's examination of the sufficiency of the evidence to support the jury's verdict?

of Health and Mental Hygiene ("DHMH"). After an individual enrolls through DHMH, the State notifies the MCO selected by the individual of the new enrollment. The MCO, in this case JAI, then sends each new enrolled member a Member Handbook ("Handbook") containing information about the health insurance benefits provided by JAI, how the member can obtain the covered health care services, how the services are paid, and the grievance procedure. Each member also receives a Provider Directory ("Directory"), which lists the approximately 4,000 providers in the JAI network, including hospitals and pharmacies.

Each member selects a primary care physician ("PCP") from the list of providers in JAI's network to provide the majority of their care. The PCP refers the member to a specialist, when necessary, using a referral form. A member can self-refer to any health care provider but, generally, JAI will only pay for the services if the member receives a referral from their PCP and the chosen provider is within JAI's network of providers. JAI enters into contracts with health care providers, hospitals, and specialists to become part of the JAI network. Each health care provider signs a standard form contract and can belong to other networks concurrently.

One of JAI's in-network health care providers, Hollis Seunarine, M.D., P.A., ("Dr. Seunarine") [2] owns and operates several medical clinics, including the Eutaw Medical Center. The reception area of the Eutaw Medical Center displays a sign stating that the provider accepts "several insurances ... Jai Medical Systems Managed Care Organizaion, Maryland Primary Care, Aetna, Blue Cross/Blue Shield, CareFirst Blue

---

**2.** Hollis Seunarine, M.D., is a physician who is also the father of JAI's owner, Jai Seunarine. "P.A." stands for "professional association." *See* Md.Code (1975, 2007 Rep. Vol.), Corporations & Associations Article § 5–101. "[T]he Maryland Professional Service Corporation Act ... [is] similar in many respects to legislation in the District of Columbia and every state except Wyoming authorizing professional corporations or professional associations[.]" *Sullivan v. Dixon*, 280 Md. 444, 449–50, 373 A.2d 1245 (1977). Dr. Seunarine formed the company with a group of doctors in the 1970s. Dr. Seunarine is also the Executive Medical Director for JAI.

Cross Blue Shield, the Department of Social Services or DSS, Medicare, Medicaid." Dr. Seunarine employs Bradford's PCP, Dr. Peter Chiang,[3] at the Eutaw Medical Center.

Dr. Bennett was not employed by Dr. Seunarine, but was a member of the JAI network of providers. Dr. Bennett signed the standard contract that every JAI network provider signs, and while JAI reviewed and approved Dr. Bennett's credentials before he joined the network, JAI did not provide Dr. Bennett with training or direct his activities or medical decisions. Dr. Bennett was listed in the Directory as a specialist (podiatrist) with an office address on Pennsylvania Avenue.

Bradford, a 57–year–old widow and mother of two who had an eighth-grade education, enrolled in JAI in 1998. At the time Bradford enrolled in JAI, she was suffering from depression, hypertension, HIV, and alcohol abuse.[4] Bradford initially received medical care at a walk-in clinic on Park Heights Avenue named "Jai Medical Center" but ultimately changed to the Eutaw Medical Center. The Eutaw Medical Center was listed on Bradford's member card as her PCP. Bradford testified that when she enrolled in JAI, she was told "that I cannot go to no clinic, no hospital, unless they accepted my card.... I have to always have a referral for some, for somebody to go to [a] specialist with a referral that works with Jai."

In July 2008, Bradford visited Dr. Chiang for treatment of pain in her right foot and a large bunion. Bradford sought a referral from Dr. Chiang for a specialist, and she specifically requested a referral for Dr. Bennett because she had spoken to another patient in the waiting area who recommended Dr. Bennett. On two subsequent occasions, Bradford specifically

---

**3.** Dr. Chiang's name is spelled as "Chang," "Cheng," and "Chiang" throughout the record. We will spell it "Chiang" as that is the spelling reflected on various medical documents in the record, including referral forms completed by the doctor himself.

**4.** At the time of trial, Bradford's depression, hypertension, and HIV were controlled by medication. She had also been sober for "six years and four days."

requested referrals to Dr. Bennett. Bradford testified that neither Dr. Chiang, nor Dr. Carr, another employee of Dr. Seunarine's at the Eutaw Medical Center she occasionally saw for primary care, recommended Dr. Bennett or told her anything other than "he take [sic] Jai Medical Assistance." Bradford testified that she had observed Dr. Bennett in a white lab coat at the Eutaw Medical Center one time, one to two years before she became his patient.[5]

After receiving the referral to Dr. Bennett, Bradford had her first office visit with Dr. Bennett in his Pennsylvania Avenue office on July 17, 2008. On July 30, 2008, Dr. Bennett performed surgery at Bon Secours Hospital on Bradford's right foot to remove her bunion. On August 8, 2008, Bradford went to Dr. Bennett's Pennsylvania Avenue office for her first follow-up visit, and Dr. Bennett performed a cursory examination that did not involve removing all of Bradford's bandages. On August 12, 2008, Dr. Bennett's nurse discovered that Bradford's toes were gangrenous and sent her to Bon Secours Hospital for treatment. On August 15, 2008, Bradford was transferred to Mercy Hospital, where her toes and part of her right foot were amputated and a bypass was performed on her right leg leaving her lower limb disfigured. It was undisputed that Dr. Bennett was negligent.[6]

On May 8, 2009, Bradford filed a complaint in the circuit court against Dr. Bennett, Bon Secours Hospital Baltimore, Inc., and Bon Secours Baltimore Health Corporation for negligence and lack of informed consent. Bradford amended her complaint, adding JAI, Jai Medical Systems, Inc.,[7] and Hollis

---

5. This part of the testimony was contradicted by testimony of Dr. Chiang and Jai Seunarine, who testified that Dr. Bennett never had privileges to see patients at the Eutaw Medical Center.

6. Dr. Bennett did not contest the lawsuit filed against him by Bradford and a default judgment was entered against him.

7. The testimony at trial was that Jai Medical Systems was the initial corporation formed in 1996, which was merged into JAI in 1997 to comply with state requirements that "Managed Care Organization" appear in the corporation's name. However, the record also shows

Seunarine, M.D., P.A., as defendants. The claim asserted against the three new defendants was that they were "responsible for the acts and/or omissions of Dr. Bennett" as he was their agent, servant, or employee.

JAI filed a motion for summary judgment prior to trial asserting that it was an insurance company that did not employ any health care providers. The motion was denied because, according to the trial court:

> The concern the Court has is that JAI's fingerprint seems to be all over this case. All over the medical treatment of Ms. Bradford. The fact that the initial doctor was in a JAI building and Dr. Cheng [sic] and, Dr. Cheng [sic] and another JAI physician referred her to Dr. Bennett, who is also connected with the system gives this Court reason to pause as far as summary judgment is concerned. Based on these concerns, the motion for summary judgment is denied.

A three-day trial began on February 22, 2011. JAI moved for judgment at the close of Bradford's case. The trial court reserved ruling on the motion in order to review the cases on apparent agency cited by counsel, and the trial proceeded with the defense.

At the close of all evidence, JAI renewed its motion for judgment which was denied. The case was submitted to the jury to determine damages and the issue of whether Dr. Bennett was the apparent agent of either JAI or Dr. Seunarine. The jury found that Dr. Bennett was not the apparent agent of Dr. Seunarine but was the apparent agent of JAI. JAI then filed timely motions for JNOV and a new trial. The court denied both motions without a hearing or written opinion.

Additional facts will be provided as necessary, in the relevant sections, below.

---

that Jai Medical Systems, Inc. was still listed as an active corporation by the State Department of Assessments and Taxation and Jai Seunarine testified that JAI used both its formal name and "Jai Medical Systems" interchangeably.

### Discussion

## I. Standard of Review

The standard of review of a trial court's denial of a motion for JNOV is the same as for a denial of a motion for judgment at the close of the evidence, that is, "whether on the evidence presented a reasonable fact-finder could find the elements of the cause of action by a preponderance of the evidence." *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md.App. 321, 329, 37 A.3d 1074 (2012) (citing *Wash. Metro. Area Transit Autho. v. Djan*, 187 Md.App. 487, 491–92, 979 A.2d 194 (2009)). "If there is any competent evidence, however slight, supporting the plaintiff's right to recover, the motion must be denied" and in a jury trial, the case should proceed to the jury for decision. *Johns Hopkins Univ. v. Ritter*, 114 Md.App. 77, 92, 689 A.2d 91 (1996); *see Gholston*, 203 Md.App. at 329, 37 A.3d 1074. The evidence must be legally sufficient, when viewed in a light most favorable to the non-moving party, to withstand a motion for judgment. *Ritter*, 114 Md.App. at 92, 689 A.2d 91. However, if the evidence "does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty, then the denial of the JNOV was error." *Jacobs v. Flynn*, 131 Md.App. 342, 353, 749 A.2d 174 (2000) (citation omitted). We review the sufficiency of the evidence *de novo*. *Gholston*, 203 Md.App. at 329, 37 A.3d 1074 (citing *Polk v. State*, 378 Md. 1, 7–8, 835 A.2d 575 (2003)).

## II. Apparent Agency

Maryland has adopted the Restatement (Second) of Agency, § 267 (1958) ("Restatement") in determining the existence of an apparent agency relationship, which states:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care of skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care of skill of the one appearing to be a servant or other agent as if he were such.

*Jacobs,* 131 Md.App. at 384–85, 749 A.2d 174. The Court of Appeals explained in *Chevron, U.S.A., Inc. v. Lesch,* 319 Md. 25, 35, 570 A.2d 840 (1990):

> The first [test] is objective: could a reasonable man believe that the company's manifestations of apparent authority indicate it is holding the operator out as its agent? The second is subjective: did the facts known by the plaintiff in a particular case reasonably justify his assumption that the operator was the company's agent?

(Citation omitted). The *Chevron* Court concluded that in order for liability to attach under the doctrine of apparent agency, a party must show that 1) they were misled by the appearances of another into believing that the tortfeasor was the other's agent; 2) that belief was objectively reasonable under all the circumstances; and 3) they relied on the existence of that relationship in making their decision to trust the tortfeasor. *Id.* at 34–35, 570 A.2d 840. Regarding the third element, the Court stated, "[t]he mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not sufficient to cause the apparent master to be liable. There must be such reliance upon the manifestation as exposes the plaintiff to the negligent conduct." *Id.* at 35, 570 A.2d 840 (citing Restatement (Second) of Agency § 267 cmt. a (1958)).

## A. Representations of Agency by JAI

■ JAI argues that it was not a health care provider, but instead was an MCO formed solely to act as an administrator of the State Medical Assistance Program (the "Program"). *See* Md.Code (1982, 2009 Repl.Vol.) §§ 15–101 *et. seq.* of the Health–General Article ("HG"). In this capacity, JAI asserts that it is an insurance provider, managing its members' access to health care providers and facilitating billing. *See* Code of Maryland Regulations ("COMAR") 10.09.62 through 10.09.75. JAI avers that it made no representations about any of the health care providers in its network and that its Handbook, Directory, and membership card were all supplied to Bradford to comply with State regulations, using language provided by

the State. JAI argues that the only evidence presented by Bradford at trial to support her argument that JAI made manifestations of apparent agency was its compliance with State law.

Bradford responds that sufficient evidence was adduced at trial that JAI, "by its words or actions, led Appellee Bradford to believe that Dr. Bennett was an agent." Bradford contends that the testimony of Jai Seunarine supports her argument that JAI, "Jai Medical Systems," and the buildings owned by Dr. Seunarine created confusion because of the similarity in names and the sharing of facilities among the various business entities. Bradford argues that the materials provided to JAI members also made representations that the medical providers in the network were agents of JAI.

■ Bradford bears the burden to show that appearances created by JAI led her to believe that Dr. Bennett was an agent of JAI. *See Mercedes–Benz of N.Am., Inc. v. Garten,* 94 Md.App. 547, 557, 618 A.2d 233 (1993). At first blush it may appear that JAI and the facilities owned and operated by Dr. Seunarine are so intertwined in name, ownership, and management as to create some confusion. However, our review of the record reveals that JAI's materials comport with State requirements for an MCO, and that JAI consistently defined itself to Bradford as an insurance provider. Medical records demonstrate that Bradford supplied JAI as the name of her insurance carrier to the various hospitals where she was treated, as well as Dr. Bennett's office, and that she signed forms explaining how her insurance company would be billed if she had a referral form. The record contains no evidence that JAI made any representations that Dr. Bennett was anything other than a health care provider in its network.

The record is similarly devoid of evidence regarding what Bradford thought she was signing up for in 1997, what her understanding of an MCO was, and who she thought employed Dr. Bennett. Bradford did not testify that she thought she could only seek treatment from providers who were **employed** by JAI. Instead, Bradford testified that she had to seek

treatment from providers who "took Jai," were "affiliated with Jai," or worked "with Jai," which included Dr. Bennett. Bradford's statements suggest that she understood that JAI was the equivalent of medical insurance, which is consistent with JAI's argument and the representations made in its Handbook. The record contains a paucity of evidence as to Bradford's subjective beliefs about the relationship between JAI and Dr. Bennett that was created by any representations of JAI. Therefore, insufficient evidence exists for a reasonable jury to find this element satisfied by a preponderance of the evidence.

## B. The Objective Reasonableness of Bradford's Belief

■ JAI argues that "it was manifestly unreasonable as a matter of law, for [Bradford] to conclude that Dr. Bennett was the employee of [JAI]." JAI asserts that no reasonable person would conclude that listing Dr. Bennett in the provider directory was an indication of employment or agency. JAI also argues that the trial court failed to apply the "general public knowledge" factor explained in *Chevron*, 319 Md. at 34–35, 570 A.2d 840, when it denied JAI's motions for judgment. JAI asserts that the general public knows that MCOs are simply insurance plans, that physicians can accept patients from multiple insurance plans, and that a provider directory is "just a listing of health care providers that accept a particular company's health insurance."

Bradford cites to her testimony that in 1997, needing a "check-up," she went to " 'Jai Medical System' on Park Heights Avenue," where she was given an exam as well as enrolled in JAI. Bradford argues that the evidence showed she believed that she could not receive medical services "unless they accepted my Jai card" and in cases of specialty care, received a referral from her PCP, Dr. Chiang, who worked at the Eutaw Medical Center. Bradford contends that no evidence on the public's knowledge about the relationship between an MCO and its providers was presented at trial and, therefore, no discussion regarding "common knowledge" should be undertaken.

A "reasonable person" is defined as "a person who exercises the degree of attention, knowledge, intelligence, and judgement that society requires of its members for the protection of their own and of other's interests." BLACK'S LAW DICTIONARY 1294 (8th Ed. 2004). Therefore, the test is whether a reasonable person in Bradford's circumstances would have believed that Dr. Bennett was an apparent agent of JAI.

The trial court, in denying JAI's motion for judgment, stated that JAI is "different because of the way that they are set up" and, therefore, "I can't find as a matter of law that it was unreasonable for the Plaintiff [Bradford] to believe the doctor was part of Jai, et. al." As discussed, even though we acknowledge the complicated corporate structure of JAI and the other defendants, the trial court's conclusion that, because of this structure alone, Bradford's beliefs were objectively reasonable, was in error.

We agree with JAI that the trial court erred in not applying the "common knowledge" test espoused in *Chevron*, 319 Md. at 34–35, 570 A.2d 840. In *Chevron*, Dr. Lesch had patronized Walker's Chevron ("Walker's"), an automobile service and gas station for many years. Walker's sold only the Chevron brand of oil, which it purchased from an intermediary. When a mechanic employed by Walker's failed to properly repair a leak in Dr. Lesch's fuel tank, Dr. Lesch and his wife were severely burned and their house was destroyed after the leak caused their car to explode. The Leschs sued Walker's for negligence and Chevron, U.S.A. on the theory that Walker's employees were apparent agents of Chevron.

In finding the Leschs' beliefs to be objectively unreasonable, the Court discussed how it is "common knowledge" that the signs and emblems displayed by independent gasoline dealers "represent no more than notice to the motorist that a given company's products are being marketed at the station." *Chevron*, 319 Md. at 36, 570 A.2d 840 (citation omitted). The Court also rejected the Leschs' argument that Chevron's allowing them to charge their purchases at Walker's to a credit card supports a finding of apparent agency. The Court stated, "[i]t

is common knowledge that major oil companies accept credit card purchases, not only of their products, but of virtually anything sold by a service station." *Id.* at 38, 570 A.2d 840.

We agree with JAI that it is common knowledge that MCOs are the equivalent of insurance providers and not the provider of actual medical services.[8] A listing of health care providers accepting a given insurance plan is not a manifestation of agency, but rather notice to the enrolled members as to whose services JAI will cover. Simply providing information to Bradford about how to obtain medical services and who accepts a particular insurance is distinguishable from providing medical services. *See P. Flanigan & Sons, Inc. v. Childs*, 251 Md. 646, 655, 248 A.2d 473 (1968) (affirming trial court's grant of motion for JNOV because "[i]t is common knowledge ... that possession of [building plans] is of itself not manifestation of an agency.").

In further support of its argument that any belief that JAI was a provider of medical services was unreasonable, JAI cites to several medical negligence cases involving apparent agency. In *Mehlman v. Powell*, 281 Md. 269, 378 A.2d 1121 (1977),

---

**8.** An MCO is required to provide "health care services" as defined in HG § 19–132(h) as "any health or medical care procedure or service rendered by a health care practitioner that ... provides testing, diagnosis, or treatment of human disease or dysfunction." The MCO retains a primary duty to ensure that its subcontractors provide the services that the MCO is required to provide, including access and quality. COMAR 10.09.65.17(C)(3) states:

> When entering into a subcontract to transfer to the subcontracting provider the initial responsibility for providing specified health care services to the MCO's enrollees, an MCO retains a primary duty to the Department and to its enrollees to ensure that its subcontractor delivers the required services in a manner that is consistent with the requirements of COMAR 10.09.62–10.09.75.

The regulations referred to include enrollment procedures, assigning PCPs, reporting requirements and planning documentation, quality assurance protocol reporting, conditions for membership, auditing, required benefits, and marketing. Nothing in the regulations requires the MCO to assume responsibility for the decisions made by any of its subcontractors in the scope of providing direct medical services. Instead, the regulations deal with how the MCO must provide access to particular medical service, documents it processes, and to keep records for the State.

Holy Cross Hospital was found vicariously liable for the actions of an emergency room physician who was an independent contractor. In *Mehlman,* the emergency room was physically attached to the hospital, its sole purpose was to provide health care services, and nothing in the emergency room put patients on notice that the emergency room was a separate facility from the hospital.

In *Hunt v. Mercy Medical Center,* 121 Md.App. 516, 710 A.2d 362 (1998), the Court concluded that a jury could find an apparent agency relationship between the hospital and independent contractor pathologist. In *Hunt,* the plaintiff was directed by his PCP to have a biopsy of his prostate done at Mercy Medical Center ("Mercy"), and the plaintiff did not seek out the individual doctor but instead sought treatment generally at Mercy, which held itself out to the public as offering medical services and essentially chose the doctor for the plaintiff.

We agree with JAI that these cases are distinguishable from the case *sub judice.* The Directory lists thousands of providers in different locations from which members can choose. Here, Bradford saw doctors first at a building named "Jai Medical" on Monument Street, then at a facility named "Eutaw Medical Center." Bradford saw Dr. Bennett in a separate office on Pennsylvania Avenue in a building that had no references to JAI on it, or to "Jai Medical." Both Dr. Bennett's office and Eutaw Medical Center contained signs indicating that the practices accepted multiple insurances, including JAI. Unlike in the cases cited above, nothing physically connected the facilities providing medical services to each other, and the patients were put on notice that the doctors within each building were affiliated with multiple insurance providers. Therefore, a belief that the doctors in each location are agents of JAI because each accepts JAI is unreasonable.

Lastly, we disagree that a reasonable person with Bradford's education, as Bradford suggests, could not comprehend that JAI was an MCO. Bradford had a history of using

Medicaid and, therefore, must have been familiar with how such a managed care system worked, and she was sophisticated enough to comply with treatment for her multiple medical issues, including HIV. There was testimony that a person seeking benefits had to apply for Medicaid prior to presenting themselves to a health care provider for treatment. The Handbook provided by JAI detailed how the MCO was set up and worked, including explaining how members could obtain treatment. There was no evidence presented that the Handbook failed to explain what JAI was, or that Bradford was unable to understand it because of her limited formal education.

### C. Bradford's Reliance on JAI's Representations

JAI argues that Bradford failed to demonstrate that she relied on any representation made by JAI in selecting him as her podiatrist. JAI asserts that the undisputed evidence shows that Bradford specifically asked Dr. Chiang for a referral to Dr. Bennett, and that neither Dr. Chiang nor Dr. Carr made any representations about Dr. Bennett other than that Dr. Bennett "take [sic] Jai Medical Assistance."

We agree that the record contains no evidence that Bradford relied on the Handbook or Directory in selecting Dr. Bennett. The testimony shows that Bradford selected the podiatrist based on another patient's statement in the waiting room of the Eutaw Medical Center, his office's proximity to her home, and his acceptance of "Jai Medical Assistance." At best, the testimony reflects that Bradford had a basic understanding that she was required to use a health care provider from JAI's network, but it does not support a conclusion that she relied on the member materials provided by JAI in choosing to see Dr. Bennett or in allowing him to operate on her foot.

Unlike in *Mehlman* and *Hunt, supra*, Bradford did not go into a medical facility and request podiatry services, only to be assigned to whatever doctor was available. Instead, she specifically requested a referral to see Dr. Bennett; Dr. Chiang

and Dr. Carr did not recommend Dr. Bennett to her. There was no evidence presented that Bradford would have gone to a different podiatrist if Dr. Bennett had been outside of the JAI network, or that she selected him solely on the basis that he accepted JAI. Instead, the record reflects that Bradford chose Dr. Bennett before she knew he accepted JAI. The law is clear that "for there to be liability in a case such as this there must be actual reliance upon the part of the person injured." *B.P. Oil Corp. v. Mabe*, 279 Md. 632, 644–45, 370 A.2d 554 (1977). Bradford did not adduce sufficient evidence to prove such reliance.

Because we find that a belief that a provider in an MCO's network is an agent of the MCO is unreasonable as a matter of law, we need not address the public policy arguments raised by JAI and Bradford.

For all of the foregoing reasons, we reverse the circuit court's judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. COSTS TO BE PAID BY APPELLEE.**