*Wilhelmina Bradford v. Jai Medical Systems Managed Care Organization, Inc.*
No. 30, September Term 2013

**Vicarious Liability - Apparent Agency - Managed Care Organizations and Network Physicians.** Under the doctrine of apparent agency, an entity may be found vicariously liable for the negligence of its apparent agent if (1) the entity makes representations that create the appearance of an employment or agency relationship; (2) the plaintiff believes that an employment or agency relationship exists and relies on that belief to the plaintiff's detriment; and (3) the plaintiff's belief is reasonable under the circumstances. An independent-contractor physician who participates in the network of a managed care organization ("MCO") may be found to be the apparent agent of the MCO, if those three conditions are satisfied. In the case before the Court, there was insufficient evidence to hold the MCO vicariously liable for the negligence of a physician in its network because the MCO's representations concerning its relationship with the physician did not create an appearance of an agency relationship and the plaintiff's subjective belief that the physician worked for the MCO was not reasonable under the circumstances.

Circuit Court for Baltimore City
Case No. 24-C-09-003115
Argued: November 4, 2013

IN THE COURT OF APPEALS
OF MARYLAND

No. 30

September Term, 2013

_____

WILHELMINA BRADFORD

v.

JAI MEDICAL SYSTEMS MANAGED CARE
ORGANIZATION, INC.

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Wilner, Alan M. (Retired, specially assigned),

JJ.

_____

Opinion by McDonald, J.

_____

Filed: June 19, 2014

The relation of appearance and reality is a fundamental question of western philosophy.[1] This case concerns the legal question of appearance and liability.

There is no dispute as to the reality of this case. Petitioner Wilhelmina Bradford suffered a significant injury to her foot resulting in its partial amputation because of the negligence of Dr. Steven Bennett, a podiatrist whom she had chosen for her treatment. She was able to see Dr. Bennett because he participated as a specialty care provider in the network of Respondent Jai Medical Systems Managed Care Organization, Inc. ("Jai MCO"), an entity that contracts with physicians, hospitals, pharmacies, and other providers to provide health care services to individuals and families enrolled in the State Medicaid program. Dr. Bennett was not an employee or agent of Jai MCO.

Ms. Bradford seeks to hold Jai MCO liable for Dr. Bennett's negligence on a theory of apparent agency – essentially, that Jai MCO created the appearance that Dr. Bennett was its employee and that she reasonably relied on that appearance.

A jury found in Ms. Bradford's favor. The Court of Special Appeals reversed that verdict on the basis that the evidence was insufficient to support it. We have reviewed the record and agree with the intermediate appellate court that, even if Ms. Bradford subjectively believed that Dr. Bennett worked for Jai MCO, that belief was not reasonable under the circumstances.

---

[1] Bertrand Russell, *The Problems of Philosophy*, Chapter 1 (1912).

## Background

*Managed Care Organizations*

Under a traditional "fee-for-service" health insurance plan, a patient pays a periodic premium to the insurance company. The patient obtains services from the health care provider of the patient's choice. The insurance company pays all or part of the provider's fee for those services. Although this model allows a patient the freedom to choose a desired provider, it does not encourage efficient use of the health care system as the cost of services may have little impact on patient demand for them and a provider's compensation depends on the quantity, not necessarily the quality, of those services.[2]

The effort to control escalating health care costs during the 1970s led to the creation of managed care organizations ("MCOs"), a phrase that encompasses a variety of organizations designed to provide health care benefits while containing costs.[3] An MCO's cost containment policies, and the amount of control the MCO exercises over its members' health care decisions, may vary according to the type and structure of the MCO. There are many different types of MCOs, the most common being health maintenance organizations ("HMOs") and preferred provider organizations ("PPOs").[4]

---

[2] A. C. Enthoven, *The History and Principles of Managed Competition,* Health Affairs (Supp. 1993) at 24, 25.

[3] P. R. Kongstvedt, Essentials of Managed Health Care 7 (6th ed. 2013).

[4] D. J. Bearden & B. J. Maedgen, *Emerging Theories of Liability in the Managed Health Care Industry*, 47 Baylor L. Rev. 285, 288 (1995).

An HMO typically contains costs by paying a provider a fixed prepaid amount for each member – sometimes referred to as a "capitation" payment – regardless of the services rendered by the provider. It may restrict members to a defined list of providers – sometimes called a "network" – from which the members may seek care financed by the HMO. It may require members to select a primary care provider from that network for basic care, and require that members obtain a referral from that physician for other services such as hospitalization and consultation with specialists. The HMO's relationship with the physicians who serve its members can take a variety of contractual forms, including direct employment.[5]

---

[5] A contemporary treatise categorizes HMOs in four basic models:

- *Independent Practice Association Model* – The HMO contracts with an association of physicians to provide health care services to its members. The HMO does not contract with the association's physicians directly. The HMO pays the association capitation payments and fees for certain services. The physicians are independent private practitioners and not employees of either the HMO or the association.

- *Direct Contract Model* – The HMO contracts directly with independent physicians or medical groups to provide physician services to their members. The HMO does the credentialing and pays physicians capitation payments and fees for certain services.

- *Group Model* – The HMO contracts with a multi-specialty medical group practice to provide all physician services to its members. The physicians in the group practice are employed by the group practice and not by the HMO. The HMO may pay the group all-inclusive capitation payments or reimburse it on a cost basis.

(continued...)

3

A PPO typically contains costs by negotiating lower fees with certain hospitals and physicians in the PPO's network, which are considered "preferred" providers. A member of the PPO pays a smaller fee – known as a co-payment – when the member sees a preferred provider instead of an "out-of-network" provider. Unlike an HMO, the PPO may not require its members to obtain authorization from a primary care physician to access care from other providers. Unlike most HMOs, the PPO may also provide coverage for "out-of network" providers, but charge a higher co-payment or deductible.

There are, of course, other variations. A common theme, however, is that an MCO exerts greater influence over its members' health care decisions – often dictating from whom and how its members receive medical services – than does a traditional fee-for-service health insurance plan.

*Jai Medical Systems Managed Care Organization*

Jai MCO is an MCO similar in structure and operation to an HMO. It was formed in 1996 by Hollis Seunarine, M.D., in response to changes in Maryland law that required Medicaid patients be enrolled in MCOs.[6] *See* Chapter 500, Laws of Maryland 1995; *see*

---

[5] (...continued)
- *Staff Model* – The HMO employs the physicians, who are typically paid on a salary basis and who may receive bonuses and other forms of incentives.

P. R. Kongstvedt, Essentials of Managed Health Care 32-33 (6th ed. 2013).

[6] The Medicaid law defines an MCO as:

> (1) A certified health maintenance organization that is
>
> (continued...)

4

*generally Roberts v. Total Health Care, Inc.*, 349 Md. 499, 523-24, 709 A.2d 142 (1998).

Under that program, also known as HealthChoice, Medicaid recipients are enrolled in an

MCO through the Maryland Department of Health and Mental Hygiene ("DHMH"). *See*

Maryland Code, Health-General Article ("HG"), §15-103(b)(16).[7] Jai MCO is offered as one

of the MCOs available to Medicaid recipients.

Jai MCO does not employ its own health care providers; rather, it enters into contracts

with physician groups, pharmacies, hospitals, and others to participate in its network and to

provide health care services to its members. The health care providers that participate in its

network are not precluded from belonging to other networks. Under Jai MCO's plan, a

member selects a primary care provider – a physician who attends to most of the member's

---

[6] (...continued)
> authorized to receive medical assistance prepaid capitation
> payments; or
>
> (2)  A corporation that:
>
>     (i) Is a managed care system that is authorized to receive
>     medical assistance prepaid capitation payments;
>
>     (ii) Enrolls only program recipients or individuals or
>     families served under the Maryland Children's Health Program;
>     and
>
>     (iii) Is subject to the [surplus and other financial
>     requirements of the Medicaid law].

HG §15-101(e).

[7] State law establishes the Medicaid program in accordance with federal law and regulates the services provided to program recipients by MCOs. The State Medicaid program is codified at HG §15-101 *et seq.*

health care needs –  from Jai MCO's network.  If the member needs specialty care, the member accesses those services by obtaining a referral from the primary care provider to one of the more than 3,000 specialists in the Baltimore metropolitan area who participate in Jai MCO's network.  The network also includes various hospitals, pharmacies, and medical laboratories.  Jai MCO operates under the name "Jai Medical Systems."[8]

Among the physicians who participate in Jai MCO's network are those employed by a professional association that was also created by Dr. Seunarine and that is formally known as  Hollis Seunarine, M.D., P.A. ("Seunarine P.A.").  Seunarine P.A. employs primary care physicians, internists, and pediatricians who work at its four medical centers in Baltimore City.  Three of those centers are named "Jai Medical Center" and one of them is called the "Eutaw Medical Center."

Dr. Seunarine named both the MCO and the professional association's medical centers after his son, Jai Seunarine, who works for both entities.  Jai MCO's administrative offices are located in the professional association's Jai Medical Center on York Road in Baltimore City. The management and administrative staff of Jai MCO and Seunarine P.A. also overlap. For example, Dr. Seunarine is both the executive medical director of Jai MCO and is a primary care provider employed by Seunarine P.A. with an office address listed at one of the Jai Medical Centers.  His son, Jai Seunarine, is the chief executive officer of Jai MCO and

---

[8] Jai MCO was initially organized under the name "Jai Medical Systems, Inc."  The corporation changed its name to "Jai Medical Systems Managed Care Organization, Inc.," but it is still commonly referred to and advertised under the name "Jai Medical Systems."

the administrator of Seunarine P.A. Thus, although they are separate legal entities, Jai MCO and Seunarine P.A. are closely related and operate under very similar names.

*Ms. Bradford Joins Jai MCO*

At the time of the events in 2008 that led to this litigation, Ms. Bradford was a 54-year-old widow with an eighth-grade education and the mother of two adult children. Eligible for benefits under the State Medicaid program, she had been a member of Jai MCO since 1997. As a member, she received various materials, including a member handbook and a provider directory that lists providers in the Jai MCO network, including approximately 4,000 primary care providers, specialists, hospitals, and pharmacies. According to Ms. Bradford, she reviewed the member handbook and the provider directory when she first enrolled in Jai MCO in 1997, and received an updated provider directory periodically.[9] According to Ms. Bradford, when she was enrolled in Jai MCO, she was told that she "cannot go where [the Jai MCO] card will not be accepted."

The member handbook is based on a template developed by DHMH that incorporates information that the MCO is required by regulation to provide to its members. *See* COMAR 10.09.66.02. Among other things, the member handbook sets forth general information such as member rights and responsibilities, provides a notice of the MCO's privacy practices concerning disclosure of medical information, lists the basic benefits provided to members

---

[9] A copy of the member handbook for 2007-08 and of the provider directory for 2009-10 appear in the record in this case. Neither party appears to assert that there were any material differences in the member handbook and provider directory available to Ms. Bradford when she joined Jai MCO or at the time of the treatment that resulted in this case.

enrolled through the Medicaid program, identifies other services available through the State of Maryland, and lists services not offered by either Jai MCO or the State (*e.g.,* cosmetic surgery, non-prescription drugs).[10] A chapter on providers describes generally primary care providers, specialty care providers, hospital providers, and pharmacy providers, and explains how a member may access services from those providers.[11] The handbook also details how

[10] For example, the "Welcome" page states:

> Your health care is very important to us. As a member of Jai Medical Systems, you will receive quality preventative care, which means you will get regular screenings and check-ups to try to prevent unnecessary illnesses. Your care will be managed and arranged by your own Primary Care Provider, whose goal is to help you stay healthy ....

[11] With respect to primary care providers, the handbook states:

> **Your Primary Care Provider**
>
> As a member of Jai Medical Systems, you will choose your **primary care provider (PCP).** If you do not choose a PCP, we will choose one for you. Your PCP will manage your health care and either provide or arrange for all of the care that you need. When you need specialty care, except for self-referral services, your PCP will provide you with the necessary referral to see a specialist. You and your PCP will work together as a team. Please get to know your PCP and make him/her aware of any health care problems or concerns that you have. This way, your PCP will get to know your complete medical history ....

A passage concerning specialists and services provided outside the Jai MCO network states:

> **What are Self-Referral Services?**
>
> You will go to your PCP for most of your health care, or your PCP will send you to a specialist who belongs to Jai Medical

<span style="float:right">(continued...)</span>

8

a member may file a complaint with Jai MCO or the State and how to transfer to another MCO.

The provider directory contains four pages listing approximately 80 primary care providers. Some, but not all, of the primary care providers worked out of Jai Medical Centers. The only "primary care centers" listed in the directory are the four operated by Seunarine P.A.[12] The following pages of the provider directory listed almost 4,000 specialty care providers and other "businesses and services" within the Jai MCO network, including most Baltimore area hospitals. None of the specialty care providers included in the directory was listed as practicing at a Jai Medical Center. For example, a large proportion of the specialty providers included in the directory were listed as practicing at Johns Hopkins Hospital. The directory also listed providers of related services that also participated in the Jai MCO network including, for example, Giant, Rite Aid, and Walmart pharmacies, among many others.

Among the 38 specialists in podiatry listed in the Jai MCO network was Dr. Steven Bennett, who began participating in the Jai MCO network in February 2006. The directory

----

[11] (...continued)
> Systems. For some types of services, you can choose a health care provider who is not part of Jai Medical Systems, and Jai Medical Systems will still pay for the service. These are called "self-referral services." Jai Medical Systems will also pay for any related lab work and medicine received at the same site that you receive the self-referral visit ....

[12] Even though Jai MCO has contracted with health care providers that practice at a wide range of hospitals and medical centers, the Jai MCO provider directory lists only the medical centers owned by Seunarine, P.A. as "Primary Care Medical Centers."

listed an address for him on Pennsylvania Avenue in Baltimore City, where he operated a private office called Penn North Foot Care.[13]  Like other physicians who participate in the Jai MCO network, Dr. Bennett signed a standard form contract with Jai MCO.  That contract specified that "[n]one of the provisions of this Agreement is intended to create ... any relationship between [Jai MCO] and [Dr. Bennett] other than that of independent entities contracting with each other ....  Neither party, nor any of their respective employees, shall be construed to be the agent, employer, employee, partner, co-venturer, or representative of the other."  Dr. Bennett participated in at least one other MCO, according to a sign in his office.

In accordance with the design of a managed care organization, Ms. Bradford was assigned to a primary care provider in the Jai MCO network.  For more than a decade, her primary care provider was Dr. Peter Chiang.  Dr. Chiang was employed by Seunarine P.A. and saw Ms. Bradford at the Eutaw Medical Center.

*Ms. Bradford Seeks Treatment for a Painful Bunion*

In 2008, Ms. Bradford began to experience foot pain as a result of a bunion on her right foot.  On July 7, 2008, she went to the Eutaw Medical Center to get a referral from Dr. Chiang for a podiatrist.  During the appointment, Ms. Bradford requested a referral specifically for Dr. Bennett.  Apparently, the planned appointment did not occur and she later asked for and obtained a second referral for Dr. Bennett, this time from Dr. Kevin Carr, another primary care provider at the Eutaw Medical Center.

---

[13] Dr. Bennett did not work for Seunarine P.A.

10

Neither of the physicians who complied with her request for a referral to Dr. Bennett told her that Dr. Bennett was Jai MCO's employee; her primary care physician, Dr. Chiang, simply informed her that "[Dr. Bennett] takes Jai Medical Assistance." According to Ms. Bradford, she nonetheless believed that Dr. Bennett worked for Jai MCO because she had previously seen him at the Eutaw Medical Center, although she admitted that there were no signs regarding Dr. Bennett at that location.[14] All of Ms. Bradford's visits to Dr. Bennett were at his private clinic on Pennsylvania Avenue.

Ms. Bradford first met Dr. Bennett on July 17, 2008, at his private office. Dr. Bennett examined her foot and recommended surgery to remove the bunion. On July 30, 2008, Dr. Bennett performed the operation at Bon Secours Hospital. Ms. Bradford was discharged from the hospital on the same day.

On August 5, 2008, Ms. Bradford returned to Dr. Bennett's office for her first follow-up visit. During the visit, Dr. Bennett conducted a cursory examination of her foot, partially unwrapping the bandage, and instructed her to come back for another follow-up visit. On August 12, 2008, during Ms. Bradford's next visit to Dr. Bennett's office, a nurse unwrapped the bandage on Ms. Bradford's foot and discovered that Ms. Bradford had developed gangrene.

---

[14] Her primary care physician, Dr. Chiang, who worked at the Eutaw Medical Center and had given Ms. Bradford a referral for Dr. Bennett, testified that he had never seen Dr. Bennett at that location. Jai MCO conceded that Dr. Bennett had been provided free office space at one of its other medical centers as an accommodation to patients with limited mobility.

11

Dr. Bennett sent Ms. Bradford to Bon Secours Hospital, where she remained for three days while she underwent various tests. Ms. Bradford was then transported to Mercy Medical Center, where doctors amputated a portion of her foot and performed a bypass on her right leg. She was discharged on August 26, 2008. Ms. Bradford must now live with permanent injuries – a partially amputated foot and a scar that runs from her right thigh to her ankle as a result of the bypass.

*The Lawsuit*

On May 8, 2009, Ms. Bradford filed this action in the Circuit Court for Baltimore City against Dr. Bennett and Bon Secours Hospital.[15] Ms. Bradford's complaint alleged, among other things, that Dr. Bennett's negligent operation on her right foot and his failure to perform timely and adequate post-operation physical examinations led to her injuries and resulting damages.[16] The complaint also alleged that the defendants failed to obtain her informed consent to operate by failing to inform Ms. Bradford that she suffered from a circulatory condition that obstructs blood flow to the legs and that would likely place her at

---

[15] Ms. Bradford named two Bon Secours entities in her complaint. During the trial, the trial judge dismissed Bon Secours Baltimore Health Corporation after the parties stipulated that Bon Secours Hospital of Baltimore, Inc. was the appropriate defendant in the case.

[16] According to Ms. Bradford's complaint, Dr. Bennett was negligent in failing to perform an adequate pre-surgical examination, which would have disclosed that she suffers from a circulatory problem that exacerbated the risks from surgery, especially in conjunction with the pneumatic ankle tourniquet that Dr. Bennett used. The complaint also alleged that the duration of the use of the tourniquet during the operation was contrary to accepted medical practice.

material risk of significant injury from the operation. Ms. Bradford subsequently amended her complaint to add Jai MCO[17] and Seunarine P.A. as defendants.

Dr. Bennett failed to respond to Ms. Bradford's complaint. The Circuit Court entered an order of default against Dr. Bennett on July 15, 2010, and a default judgment on November 10, 2010. Assessment of damages was to be determined at trial.

The remaining defendants each filed motions for summary judgment prior to trial. Jai MCO's motion asserted that it was a health insurer that did not employ Dr. Bennett – or any physicians. The Circuit Court denied the summary judgment motions and the case proceeded to trial.

*The Trial*

The trial took place from February 22 to February 24, 2011. At the close of Ms. Bradford's evidence, the defendants moved for judgment, incorporating arguments made in their motions for summary judgment. The trial judge reserved ruling on those motions, and the defense presented its case. At the close of all the evidence, the defendants renewed their motions for judgment. The trial judge granted Bon Secours' motion for judgment, but denied the motions of Jai MCO and Seunarine P.A.

As a result of the default judgment, the liability of Dr. Bennett was not at issue at the trial. At the conclusion of the trial, the jury was asked to determine only the amount of

---

[17] Ms. Bradford sued Jai MCO under both its original name – Jai Medical Systems, Inc. – and its current name – Jai Medical Systems Managed Care Organization, Inc. *See* footnote 8 above.

13

damages, and whether Jai MCO and Seunarine P.A. were also liable under the theory that Dr. Bennett was the apparent agent of either or both of those entities.

The jury awarded $64,000 for economic damages and medical expenses, and $3,000,000 for non-economic damages. The jury further found that Jai MCO, but not Seunarine P.A., was liable under the theory of apparent agency. The Circuit Court granted a motion for remittitur based on the statutory cap on non-economic damages that reduced the total damages to $714,000. The court denied Jai MCO's motion for judgment notwithstanding the verdict and for a new trial. Jai MCO appealed.

*The Appeal*

The Court of Special Appeals reversed, holding that the Circuit Court should have granted Jai MCO's motion for judgment notwithstanding the verdict. 209 Md. App. 68, 57 A.3d 1068 (2012). Ms. Bradford filed a petition for a writ of certiorari in this Court, which we granted to determine whether an MCO may be held liable for the negligence of a physician in its network under the theory of apparent agency and, if so, whether there was sufficient evidence to support the jury verdict in this case.

## Discussion

Ms. Bradford concedes that Dr. Bennett was not an employee of Jai MCO and that no actual agency relationship existed between Dr. Bennett and Jai MCO. She nevertheless argues that Jai MCO could be found liable for Dr. Bennett's negligence under the theory of apparent agency.

14

***Standard of Review***

In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, an appellate court considers whether there is "any evidence adduced, however slight ... from which reasonable jurors, applying the appropriate standard of proof, could find in favor of the plaintiff on the claims presented." *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 333, 71 A.3d 30 (2013) (citations omitted). In doing so, the court considers "the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party." *Id.* Whether a particular theory of liability may apply and the appropriate standard of proof under that theory are necessarily legal questions on which the reviewing court is not required to accord any deference to the trial court.

In this case, the trial court's judgment was based on the jury's conclusion that Dr. Bennett was the apparent agent of Jai MCO. The existence of an agency relationship is ordinarily a question of fact for the jury. But a theory of apparent agency also depends on whether a plaintiff's subjective belief that an agency relationship existed was justifiable or reasonable – in this case, whether a physician in an MCO's network may be the MCO's apparent agent. A threshold legal question is whether the theory of apparent agency can apply in this context. If so, a second legal question is whether, applying the deferential standard of review described above, the facts of this case allow application of that theory to uphold the judgment.

***Whether an MCO may be vicariously liable for the negligence of a network physician under a theory of apparent agency***

As a general rule, one who engages an independent contractor is not vicariously liable for the negligence of the contractor. *Rowley v. Mayor & City Council of Baltimore*, 305 Md. 456, 461-62, 505 A.2d 494 (1986). There are a number of exceptions to this general principle. *Id*. Pertinent to this case, there may be vicarious liability under the theory of apparent agency. *See* Restatement (Second) of Agency §267, *Illustration 4*. Apparent agency is an equitable doctrine, whereby a principal is held responsible for the acts of another because the principal, by its words or conduct, has represented that an agency relationship existed between the apparent principal and its apparent agent.

This Court has applied the theory of apparent agency to uphold a judgment against a hospital for the negligence of an independent-contractor physician with whom it contracted to staff the hospital's emergency room. In *Mehlman v. Powell,* 281 Md. 269, 378 A.2d 1121 (1977), the patient, who was suffering shortness of breath and other discomfort, went to the emergency room of a hospital, where he was treated by a physician who, with other physicians, had contracted to operate the emergency room as independent contractors. The physician misread the patient's electrocardiogram and, as a result, failed to realize that the patient was in imminent danger of heart failure due to a pulmonary embolism. 281 Md. at 271. The patient was sent home and died two days later due to the pulmonary embolism. His survivors sued both the doctor and the hospital for medical malpractice and obtained a judgment against them.

16

On appeal, the hospital argued that it was entitled to a directed verdict because the emergency room was operated by an independent contractor. *Mehlman*, 281 Md. at 272. To determine whether the hospital could be held liable for the malpractice of an independent-contractor physician, the Court applied the concept of apparent agency as described in Restatement (Second) of Agency §267, which states:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

281 Md. at 273.[18] The Court concluded that the hospital could be found liable on the facts of the case before it. The physical proximity of the emergency room to the hospital and the absence of any signs indicating that the emergency room was not part of the hospital were sufficient to constitute a representation by the hospital that it employed the negligent physician. The Court held that a jury could conclude that a patient's belief that the physician was an employee of the hospital was reasonable: "all ordinary expectations would be that the Hospital emergency room, physically a part of the Hospital, was in fact an integral part of the institution. It is not to be expected, and nothing put [the decedent] on notice, that the various procedures and departments of a complex, modern hospital … are in fact franchised out to various independent contractors." *Id*. at 274.

---

[18] As the Court in *Mehlman* noted, a previous decision had endorsed §267 as an accurate statement of the doctrine of apparent agency under Maryland law. *See B.P. Oil Corp. v. Mabe*, 279 Md. 632, 643, 370 A.2d 554 (1977).

In subsequent cases, appellate courts in Maryland have relied on the discussion of apparent agency in *Mehlman* to assess the potential liability of hospitals for the negligence of independent-contractor physicians. *See, e.g., Debbas v. Nelson*, 389 Md. 364, 385-86, 885 A.2d 802 (2005) (whether hospital was vicariously liable for negligence of physicians under theory of apparent authority was question for jury to resolve due to dispute of material facts); *Hunt v. Mercy Medical Center*, 121 Md. App. 516, 547-48, 710 A.2d 362 (1998) (same); *cf. Hetrick v. Weimer,* 67 Md. App. 522, 532-35, 508 A.2d 522 (1986) (affirming the trial court's grant of motion for directed verdict on the basis that there was insufficient evidence to allow the jury to consider the hospital's liability under the theory of apparent agency).

As applied by Maryland courts, the doctrine of apparent agency can be expressed in three elements:

> 1.    Did the apparent principal create, or acquiesce in, the appearance that an agency relationship existed?
>
> 2.    Did the plaintiff believe that an agency relationship existed and rely on that belief in seeking the services of the apparent agent?
>
> 3.    Were the plaintiff's belief and reliance reasonable?

*See Chevron U.S.A., Inc. v. Lesch*, 319 Md. 25, 34-35, 570 A.2d 840 (1990); *see also Klein v. Weiss*, 284 Md. 36, 61, 395 A.2d 126 (1978) ("Apparent authority results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act."); *Parker v. Junior Press Printing Services, Inc.,* 266 Md. 721, 727-28, 296 A.2d 377 (1972) ("Succinctly stated, apparent authority to do an act is

18

created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.").

As is evident, the doctrine of apparent agency has both subjective and objective elements: a plaintiff must show that the plaintiff subjectively believed that an employment or agency relationship existed between the apparent principal and the apparent agent, and that the plaintiff relied on that belief in seeking medical care from the apparent agent. But the plaintiff must also show that the apparent principal created or contributed to the appearance of the agency relationship and that the plaintiff's subjective belief was "justifiable" or "reasonable" under the circumstances – an objective test. *See Reserve Ins. Co. v. Duckett*, 240 Md. 591, 600-1, 214 A.2d 754 (1965) ("It must be reasonable for the third person dealing with the alleged agent to believe that the agent has authority to act."); *Chevron,* 319 Md. at 35 (explaining that, in order to recover under the theory of apparent agency, the plaintiffs must show that their belief "was objectively reasonable under all of the circumstances"); *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md. App. 431, 440-41, 518 A.2d 151 (1986) ("Under this doctrine [of apparent agency], the crucial factor is reasonable reliance by a third party on the principal's conduct.").

As outlined above, MCOs come in many flavors. Some are HMOs that may actually employ the physicians who serve their members.[19] Even if an MCO does not itself employ physicians, it is conceivable that – like the hospital in *Mehlman* – it may identify a physician who serves its members in a way that leads a member to believe, reasonably albeit incorrectly, that the physician is an employee of the MCO. Thus, in our view, there is no reason to preclude application of the theory of apparent agency in the context of an MCO and a network physician.[20]

***Whether Jai MCO may be found vicariously liable in this case***

The question in this case is whether a jury could reasonably conclude that the criteria of the Restatement §267 for apparent agency were satisfied – that Jai MCO made representations that suggested that Dr. Bennett was its agent, that Ms. Bradford subjectively believed that Dr. Bennett was Jai MCO's agent and relied on that belief in seeking services from him, and that her belief was reasonable under the circumstances. One of these criteria is subjective, the other are two objective. We begin with the subjective element.

---

[19] In a case against a physician of such an MCO, a plaintiff presumably would not rely on a theory of *apparent* agency as the physician would be an actual agent of the MCO.

[20] Courts in several other jurisdictions have held that an MCO may be held liable for the negligence of an independent-contractor physician under the theory of apparent agency, sometimes referred to as ostensible agency or agency by estoppel. *See Petrovich v. Share Health Plan of Illinois, Inc.*, 719 N.E.2d 756, 766 (Ill. 1999) (HMO may be liable for network physician malpractice if it "holds itself out as the provider of health care" and a member justifiably relies on that representation); *Ramos v. Preferred Medical Plan, Inc.,* 842 So.2d 1006, 1008 (Fl. App. 2003) (same); *Boyd v. Albert Einstein Medical Center*, 547 A.2d 1229, 1231-32, 1234 (Pa. Super. 1988) (same).

*Ms. Bradford's Subjective Belief*

Ms. Bradford testified that she believed that Dr. Bennett was an employee of Jai MCO for two reasons – first, she had previously seen him at Eutaw Medical Center, one of the medical centers operated by Seunarine P.A., and second, she believed that Jai MCO employed the physicians, including Dr. Bennett, who accepted her Jai MCO card – *i.e*., who were in Jai MCO's network. Although Jai MCO introduced evidence suggesting that her sighting of Dr. Bennett at the Eutaw Medical Center was inaccurate, a jury could accept her version and reasonably conclude that Ms. Bradford believed that Dr. Bennett was an employee of Jai MCO and relied on that belief in seeking treatment. Thus, she presented sufficient evidence to satisfy the subjective element of apparent agency under the Restatement §267. Linking that belief to representations made or adopted by Jai MCO, however, is another matter.

*Jai MCO's Representations Concerning its Relationship with Dr. Bennett*

The only representations by Jai MCO concerning its relationship with Dr. Bennett that appear in the record are the listing of Dr. Bennett in the provider directory, the referral forms that permitted Ms. Bradford to see Dr. Bennett through Jai MCO under the Medicaid program, and some general passages concerning providers in the member handbook.

As indicated above, the provider directory lists nearly 4,000 specialty providers, many associated with Johns Hopkins Hospital and other institutions throughout the Baltimore metropolitan area, as part of Jai MCO's network and also lists various hospitals, pharmacies,

21

and other entities as participating in Jai MCO's network. It does not identify any of these providers as an agent or employee of Jai MCO.

The referral forms simply document the specific referrals Ms. Bradford requested for Dr. Bennett and contain general instructions for specialists about how to bill Jai MCO for services provided to its members. These forms hardly suggest that a specialist is an employee of the MCO, do not specifically identify Dr. Bennett as an agent or employee of Jai MCO and, in any event, were created *after* Ms. Bradford asked for a referral to him.

The passages highlighted by Ms. Bradford's counsel in the member handbook [21] are general in nature, say nothing about Dr. Bennett or any other specific provider, and do not assert an employment or agency relationship between Jai MCO and network providers. Ms. Bradford's counsel focuses on a passage in the member handbook about referrals that mentions specialists who "belong" to Jai MCO's network.[22] Of course, one may "belong" to many entities or institutions without being an employee or agent of any.

*The Reasonableness of Ms. Bradford's Belief*

Finally, we turn to the question whether Ms. Bradford's belief that Dr. Bennett worked for Jai MCO could be found to be justifiable or reasonable. We conclude that a jury could not reasonably make such a finding.

---

[21] See footnotes 10-11 above.

[22] This particular language was taken verbatim from the template produced by DHMH for MCOs in the Medicaid program. See pp. 7-8 above.

22

The member handbook, provider directory, and referral forms, considered individually or collectively, do not provide a basis for inferring that Dr. Bennett was the agent of Jai MCO. The provider directory itself effectively relieves any reader of the notion that all network participants are employees of Jai MCO. The list of network participants encompasses nearly 4,000 providers listed at various private addresses and at hospitals such as Maryland General Hospital, Bayview Medical Center, and Johns Hopkins Hospital. The sheer number of physicians, the range of hospitals, medical centers and private offices, and the inclusion of entities such as Walmart, Giant Food, and Rite Aid on the list of network providers would preclude any reasonable belief of agency based on those documents. In any event, there is no evidence that Ms. Bradford relied on those documents in concluding that Dr. Bennett was employed by Jai MCO.

Nor could Ms. Bradford's one-time sighting of Dr. Bennett at Eutaw Medical Center, one of several medical centers operated by Seunarine P.A., justify a belief that Dr. Bennett was an employee of Jai MCO. Even if the sighting is considered in light of possible confusion about the meaning of statements in the member handbook – for example, that Jai MCO provides "health care benefits" and that members will be referred only to specialists who "belong" to Jai MCO – it provides no basis for concluding that Dr. Bennett was an employee of Jai MCO.

Finally, the circumstances of Dr. Bennett's treatment of Ms. Bradford – which did not involve representations by Jai MCO – did not suggest that the MCO had an agency

23

relationship with the podiatrist. The initial examination of Ms. Bradford's foot and the post-surgery follow-up visits took place at Dr. Bennett's private office at Penn North Foot Care.[23] The surgery was performed at Bon Secours Hospital, which is not part of Jai MCO's network. These circumstances contrast with those in *Mehlman* where the physical proximity of the emergency room to the hospital and the lack of any signs indicating that the emergency room was separate from the hospital created an "expectation" that the emergency room was part of the hospital and that the emergency room physicians were hospital employees.

*Summary*

Regardless of whether Ms. Bradford subjectively believed that Dr. Bennett was an employee of Jai MCO and relied on that belief in seeking medical care from Dr. Bennett, we hold that there was insufficient evidence to create a question for the jury because Ms. Bradford's reliance was not justifiable given the actual representations made by Jai MCO concerning its relationship with Dr. Bennett and the other circumstances of this case. We therefore affirm the holding of the Court of Special Appeals that reversed the Circuit Court's denial of Jai MCO's motion for judgment notwithstanding the verdict.

---

[23] Had Dr. Bennett maintained his office and treated Ms. Bradford at one of the Jai Medical Centers, our conclusion might well be different. As indicated earlier, Jai MCO operates and advertises itself under the name "Jai Medical Systems" and has its administrative office with overlapping staff at a "Jai Medical Center" operated by Seunarine P.A. While Jai MCO and Seunarine P.A. are distinct legal entities, their common management and location and use of very similar names could appear to indicate an agency relationship between the MCO and the physicians of the professional association, perhaps as strong as the apparent agency relationship between the hospital and emergency room staff in *Mehlman*.

24

We differ from the intermediate appellate court in a key respect. The Court of Special Appeals relied in part on a "common knowledge" test in concluding that Ms. Bradford's belief that Dr. Bennett was an employee of Jai MCO was not objectively reasonable.[24] The court identified two "commonly known" facts: (1) MCOs are the "equivalent of insurance providers" and (2) MCOs are not providers of medical services. 209 Md. App. at 81. Because that "common knowledge" contradicted Ms. Bradford's belief, the court concluded that her belief was unreasonable.

We hesitate to rely on a "common knowledge" theory in this case for several reasons. While MCOs are similar to traditional fee-for-service insurers in that they finance health care services, they are quite diverse and can differ from traditional insurers in several ways, including their relationship with the physicians who serve their members. Indeed, some MCOs – staff-model HMOs – hire salaried physicians to provide health care to their

---

[24] This Court developed the "common knowledge" test to assess a claim of apparent agency in the context of the franchisor's liability for the negligence of its franchisee. In *B.P. Oil Corp. v. Mabe*, 279 Md. 632, 634, 370 A.2d 554 (1977), the plaintiff sought to hold an oil company (the franchisor) liable for an injury the plaintiff suffered as a result of the negligence of an employee of a service station (the franchisee). In that case, the service station employee put gasoline rather than water in the radiator of the plaintiff's vehicle, resulting in an explosion. The Court held that the plaintiff's belief that the station was owned and controlled by the oil company was not justifiable despite the fact that the oil company's insignia appeared on the service station's sign and gas pumps because "[i]t is a matter of common knowledge that these trademark signs are displayed throughout the country by independent dealers." 279 Md. at 646. *See also Chevron*, 319 Md. at 36-38 (holding that the franchisor oil company was not liable for the negligence of the franchisee service station because it is "common knowledge" that signs and emblems displayed by independent gasoline dealers represent "no more than notice to the motorist that a given company's products are being marketed at the station" and that major oil companies accept credit card purchases of virtually anything sold by a service station).

members.  It is true that Jai MCO is not a staff-model HMO, but that is a distinct proposition from the notion that it is "common knowledge" that MCOs do not employ physicians. Finally, we observe that, when a court makes reference to "common knowledge" in this context, it is essentially taking judicial notice of decisive facts without supporting its conclusion in the evidentiary record or by reference to any authoritative source.[25]  *Cf.* Maryland Rule 5-201(b) (facts subject to judicial notice).  We should do so only when the "common knowledge" is so well accepted that there is no possibility that a person of ordinary intelligence and education would come to a different conclusion.  In this regard, it is not clear that the details of health care finance are "common knowledge" even to well educated members of our society.[26]

## Conclusion

What happened to Ms.  Bradford – the botched operation and the resulting partial amputation of her foot and scarring of her leg – is tragic.  The question in this case was whether the MCO that financed that operation on her behalf should be held liable for the

---

[25] The application of the "common knowledge" test in the franchisor-franchisee context has been criticized on the ground that courts use it to decide cases on the basis of "common knowledge" that is not supported by evidence or subject to adversary testing.  R. Emerson, *Franchisors' Liability When Franchisees Are Apparent Agents: An Empirical and Policy Analysis of "Common Knowledge" About Franchising*, 20 Hofstra L. Rev. 609, 646-51 (1992).

[26] Recent studies suggest that health care finance is not a matter of common knowledge.  *See* G. Loewenstein, *et al.*, *Consumers' Misunderstanding of Health Insurance*, 32 Journal of Health Economics 850-62 (June 2013); B. Japsen, *Americans Don't Understand Insurance, Let Alone Obamacare, Research Shows*, Forbes (Aug. 10, 2013) http://www.forbes.com/sites/brucejapsen/2013/08/10/americans-don't-understand-insurance-let-alone-obamacare-study-shows/.

negligence of the physician who performed it. Ms. Bradford attempted to establish such liability under a theory of apparent agency. But even if she subjectively believed that Dr. Bennett was an employee of Jai MCO and relied on that belief in seeking medical care from Dr. Bennett, that belief was not objectively reasonable under the facts of this case. There was insufficient evidence for a jury to conclude that Dr. Bennett was the apparent agent of Jai MCO.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**