*Terence Williams v. Dimensions Health Corporation*
No. 42, September Term 2021

**Medical Malpractice – Vicarious Liability – Hospital Emergency Room – Apparent Agency.** Under the doctrine of apparent agency, an entity may be found vicariously liable to a third party for the negligence of its apparent agent if (1) the entity represents, or acquiesces in the appearance, that an individual is its agent; (2) the third party relies on that appearance to the party's detriment; and (3) the third party's reliance is reasonable under the circumstances. There was sufficient evidence to support a jury verdict finding a hospital vicariously liable for the negligence of a surgeon in its trauma center when (1) the hospital had obtained designation under State law of its emergency room as a trauma center, which required that it have a trauma surgeon available to treat serious injuries sustained as a result of emergencies; (2) emergency medical services personnel dispatched to the scene of a serious car accident relied on that designation to transport the victim of the accident to that trauma center in accordance with State regulations; and (3) there was no evidence that the victim was informed in any way at the trauma center that the surgeon was an independent contractor, as opposed to an employee, of the hospital. Even if forms or signs at the trauma center had described the formal contractual relationship of the surgeon with the hospital, such notice would not have been timely and meaningful so as to negate the apparent agency relationship in a situation involving a patient in distress as a result of a serious car accident.

Circuit Court for Prince George's County
Case No. CAL17-35481
Argued: March 8, 2022

TERENCE WILLIAMS

V.

DIMENSIONS HEALTH CORPORATION

*Getty, C.J.,
Watts
Hotten
Biran
Gould
Raker, Irma S.
  (Senior Judge,
    Specially Assigned),
McDonald, Robert N.
  (Senior Judge,
    Specially Assigned)
              JJ.

Opinion by McDonald, J.
Getty, C.J., and Biran, J., dissent.

Filed: July 28, 2022

*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, §3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case concerns whether a hospital is vicariously liable for a surgeon's negligence in treating a patient in the hospital's emergency facility, which had been specifically designated for treating patients with serious and life-threatening injuries on an emergency basis. The patient, Petitioner Terence Williams, had suffered serious injuries as a result of a late night motor vehicle crash and had been transported by ambulance to the trauma center at the Prince George's Hospital Center of Respondent Dimensions Health Corporation ("the Hospital"). He suffered further injuries when the surgeon who treated him there failed to exercise the standard of care expected of trauma surgeons.

Mr. Williams sued both the surgeon and the Hospital in the Circuit Court for Prince George's County. The Hospital contended that the surgeon, like other staff at its trauma center, was an independent contractor rather than an employee of the Hospital and that the Hospital therefore was not responsible for his conduct in treating Mr. Williams. However, under prior decisions of this Court, as well as decisions by other courts around the country, a hospital may be vicariously liable for the negligence of a health care provider who staffs the hospital's emergency room, regardless of the formal relationship between the provider and the hospital, under the doctrine of apparent agency.

At the trial of this case, the jury returned a verdict finding that the surgeon was negligent and directly liable, that the surgeon was an agent of the Hospital, and that the Hospital was vicariously liable for that negligence. The Hospital moved for judgment notwithstanding the verdict on the ground that there was insufficient evidence to show that Mr. Williams had believed that the surgeon was an agent of the Hospital when he was brought there by the ambulance. The Circuit Court granted that motion and the Court of

Special Appeals affirmed that ruling. For the reasons set forth in this opinion, we disagree and reverse the judgment of the intermediate appellate court. A court may not overturn a jury verdict if there is sufficient evidence, however slight and viewed in the light most favorable to the prevailing party, to support the verdict. In this case, there was ample evidence introduced at trial that, if credited by the jury, supported the jury's finding that the surgeon was the apparent agent of the Hospital.

# I

## Background

### A. *Hospital Emergency Rooms*

#### 1. Generally

An emergency room, or emergency department, as the name implies, is the part of a hospital that specializes in emergency medicine – the acute care of patients who appear at the facility without prior appointment, sometimes by ambulance. As a result of the nature of the care it provides, an emergency room will often operate around the clock. An emergency room must be prepared to provide treatment for a broad spectrum of unforeseen illnesses and injuries, many of which are serious and life-threatening.[1] Closely related to emergency rooms are trauma centers where surgeons who specialize in trauma care treat patients with injuries from incidents such as serious motor vehicle crashes. Emergency

---

[1] *See* American College of Emergency Physicians, *Definition of Emergency Medicine*, https://www.acep.org/patient-care/policy-statements/definition-of-emergency-medicine/, available at https://perma.cc/D4NX-5L9E.
   In some geographic areas, residents without other access to health care may rely on hospital emergency rooms for their primary care.

rooms in hospitals that receive payments from Medicare must provide appropriate emergency treatment to all individuals who seek it, regardless of ability to pay, among other things.[2]

>    2.    Designations of Emergency Facilities in Maryland

To coordinate the delivery of emergency and trauma care to patients in distress in Maryland, the General Assembly has created the Maryland Institute for Emergency Medical Services Systems ("MIEMSS"). Maryland Code, Education Article ("ED"), §13-501 *et seq*.; *see also* COMAR, Title 30. MIEMSS is charged with "coordination of all emergency medical services" in the State. ED §13-504(a).

According to MIEMSS, there are 48 hospital emergency departments in the State. *See* MIEMSS, *Hospitals – Introduction*.[3] "It is imperative that all seriously ill and injured patients be delivered in a timely manner to the closest appropriate facility." *Id*. MIEMSS has developed a trauma and emergency medical system ("EMS") to ensure "that the patient get[s] to the right facility to receive the right care through the use of statewide medical protocols for EMS clinicians." *Id*. For that purpose and pursuant to its statutory authority, MIEMSS has designated nine trauma centers and specialty referral centers. *Id*.; *see also* ED §13-509; COMAR 30.08.02. MIEMSS classifies trauma centers into four categories, according to the availability of physicians and resources at the particular location. *See*

---

[2] Emergency Medical Treatment and Active Labor Act (1986), 42 U.S.C. §1395dd.

[3] Available at https://www.miemss.org/home/hospitals, https://perma.cc/XZ5H-DE2G.

COMAR 30.08.02.01; *see also* https://www.miemss.org/home/hospitals/trauma-centers.[4]

Pertinent to this case, a Level II trauma center must satisfy various criteria, including having a trauma surgeon available in the hospital and an orthopedic surgeon on-call at all times. COMAR 30.08.05.09 Under the MIEMSS regulations, a hospital applies for an appropriate designation for its emergency facility. COMAR 30.08.02.03.

### B. *Agents – Actual and Apparent*

The common law concept of agency applies in various contexts in Maryland law. This Court has defined the concept as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Green v. H & R Block, Inc.*, 355 Md. 488, 503 (1999) (quoting Restatement (Second) of Agency, §1); *see also* Restatement (Third) of Agency, §1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). The existence of an agency relationship depends on the facts of the particular relationship; labels are not dispositive. *See* Restatement (Third) of Agency, §1.02 ("Parties' Labeling and Popular Usage Not Controlling"). For example, an actual agency relationship may exist even as to one labeled an "independent contractor." Restatement (Second) of Agency §14N & *comment a* ("'[I]ndependent contractor' is a term which is antithetical to the word 'servant', although not to the word 'agent'".).

---

[4] Available at https://perma.cc/JDQ9-6NZ3.

Even when the legal definition of actual agency is not satisfied, the parties may still have an "apparent agency" relationship – sometimes referred to as "ostensible agency" or "agency by estoppel." While the existence of an actual agency relationship depends in part on the perspective of a reasonable agent, the existence of an apparent agency relationship depends in part on the perspective of a reasonable third party. *See Bradford v. Jai Med. Sys. Managed Care Organizations, Inc.*, 439 Md. 2, 18 (2014); Restatement (Third) of Agency §2.03 (defining "apparent authority" as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations"). This doctrine prevents a principal from "choos[ing] to act through agents whom it has clothed with the trappings of authority and then determin[ing] at a later time whether the consequences of their acts offer an advantage." Restatement (Third) of Agency §2.03, *comment c*.

## C.      *Liability of Hospital for Actions of Emergency Room Staff as Apparent Agents*

A hospital can have a variety of formal employment or contractual relationships with the health care professionals who staff the hospital. *See* Marah Short *et al.*, Baker Institute for Public Policy of Rice University, *The Integration and De-Integration of Physicians and Hospitals over Time* at 3 (Jan. 2017) (describing four models of employment or contractual relationships of hospitals with physicians).[5] The use of independent contractors is more prevalent in emergency medicine than in any other

___

[5] Available at https://scholarship.rice.edu/bitstream/handle/1911/94097/CHB-pub-PHITrends-012417.pdf; https://perma.cc/Q9J5-QV76.

medical specialty.  *See* Carol K. Kane, *Updated Data on Physician Practice Arrangements*, Am. Med. Ass'n Policy Research Perspectives at 8 (2019)[6] (noting that, in emergency medicine, "more than one-quarter of physicians were independent contractors, a share that was more than 10 percentage points higher than that of any other specialty").  A recent trend has been for hospitals to "outsource" the operation of the emergency room to an independent entity entirely.[7]

One issue raised by a hospital's use of independent contractors rather than employees to staff its emergency room is whether the use of independent contractors changes the hospital's vicarious liability for any negligence by its emergency room staff in the treatment of patients.  Substantial case law around the country, as well as two decisions of this Court, have assessed such liability under the common law doctrine of apparent agency.

1.      Maryland Case Law

This Court has previously had two occasions to address a hospital's vicarious liability based on apparent agency for the negligence of physicians staffing its emergency room.  In both cases, the hospital contended that it was not vicariously liable because the physicians staffing its emergency room were independent contractors.  In both cases, the

---

[6] Available at https://www.ama-assn.org/system/files/2019-07/prp-fewer-owners-benchmark-survey-2018.pdf; https://perma.cc/NQ39-4RBW.

[7] *See* Robert Derlet, et al., *Corporate and Hospital Profiteering in Emergency Medicine: Problems of the Past, Present, and Future*, 50 J. Emergency Medicine 902, 903 (2016), https://www.jem-journal.com/action/showPdf?pii=S0736-4679%2816%2900007-X, available at https://perma.cc/S2R2-6GVX.

6

Court concluded that there was sufficient evidence to establish that those physicians were apparent agents of the hospital, even if they were not employees or actual agents of the hospital. *Mehlman v. Powell*, 281 Md. 269 (1977); *Debbas v. Nelson*, 389 Md. 364 (2005), *aff'g* 160 Md. App. 194 (2004).

*Mehlman*

In *Mehlman*, a man experiencing shortness of breath and other discomfort initially consulted a specialist recommended by his primary care physician. The specialist failed to perform a standard test that would have revealed a treatable condition. That condition worsened over the course of several months. One day, when the patient was unable to get out of bed and the specialist was unreachable, he was taken to a hospital emergency room. The physician staffing the emergency room ordered several tests, but misread the electrocardiogram and failed to realize that the patient was suffering from a life-threatening condition. The patient was released from the emergency room and died shortly thereafter. 281 Md. at 271.

The wife and children of the patient sued the specialist, the emergency room doctor, and the hospital. At trial, the plaintiffs asserted that the hospital was vicariously liable for the negligent acts of the emergency room doctor who, the plaintiffs argued, was the hospital's actual or apparent agent. The hospital countered that the physicians in its emergency room were independent contractors and that it was not vicariously responsible for their actions. After the trial court denied the hospital's motion for a directed verdict, the jury returned a verdict in favor of the plaintiffs against the hospital and other defendants, and the trial court entered judgment on that verdict. 281 Md. at 271-72.

7

On appeal, this Court assumed that there was no employer-employee relationship between the hospital and the emergency room doctor that would make him the hospital's actual agent. 281 Md. at 272-73. Instead, the Court looked to the common law doctrine of apparent agency. It noted its approval in a prior case, outside of the medical context, of the articulation of that doctrine in §267 of the Restatement (Second) of Agency. *Id.* at 273.

The Court then addressed the sufficiency of the evidence to support the jury's determination that the hospital was vicariously liable for the emergency room doctor's negligence. The Court noted that the record contained various facts that gave the appearance that the physician was an agent of the hospital, such as the proximity of the emergency room to the hospital, the absence of any signage indicating otherwise, and the general business of the hospital in providing health care to the community. 281 Md. at 274. "The Hospital … is engaged in the business of providing health care services. One enters a hospital for no other reason…. [The patient] obviously desired medical services and equally obviously was relying on [the Hospital] to provide them." *Id.* It noted that "all appearances suggest and all ordinary expectations would be that the Hospital emergency room, physically a part of the Hospital, was in fact an integral part of the institution." *Id.* Finally, the Court observed that "[i]t is not to be expected, and nothing put [a patient] on notice, that the various procedures and departments of a complex, modern hospital … are in fact franchised out to various independent contractors." *Id.*

The Court concluded that these factors amounted to a representation by the hospital that the staff in the emergency room were its employees and the hospital therefore was liable for the negligent actions of the emergency room staff as if they were employees. *Id.*

8

at 275.  Accordingly, the Court held that a factfinder could find the hospital vicariously liable for the emergency room doctor's negligence under an apparent agency theory.

*Mehlman* was one of the earliest cases in the country that, in applying the doctrine of apparent agency in malpractice cases involving emergency room staff, looked to the nature and mission of a hospital, the general expectations of the public and patients in particular, and the extent to which a hospital dispelled those expectations.  Many of the subsequent cases in other jurisdictions cited and relied on *Mehlman*.

*Debbas*

More than two decades later, the Maryland appellate courts again considered a hospital's vicarious liability for the negligent actions of its emergency room staff.  In *Debbas*, a woman experiencing weakness and fatigue visited a hospital emergency room. The emergency room doctor diagnosed her as having mild anemia, prescribed some medication, and advised her to follow up with her primary care physician.  The symptoms persisted.  After seeing her own physician, she returned a few days later to the emergency room where she was treated by several doctors, but died later that evening.  389 Md. at 367.

Her survivors brought a malpractice action against the doctors and the hospital.  The hospital asserted that the emergency room physicians were independent contractors.  The circuit court granted the hospital's motion for summary judgment on the ground that the plaintiffs had failed to make a *prima facie* showing of "apparent authority."  389 Md. at 370.

9

On appeal, the Court of Special Appeals disagreed, looking to §267 of the Restatement (Second) of Agency and *Mehlman*. The intermediate appellate court quoted language in the hospital's medical consent form that referred to the physicians as "staff" of the hospital. It also noted that one of emergency room doctors was the president of the medical staff and chief of surgery at the hospital. *Nelson v. Debbas*, 160 Md. App. 194, 212 (2004), *aff'd*, 389 Md. 264 (2005). The court concluded that, taken together, these facts created a genuine dispute of material fact regarding an apparent agency relationship between the physicians and the hospital. Accordingly, the circuit court should not have awarded summary judgment in favor of the hospital. *Id*. at 213.[8] In discussing the apparent agency issue, the court observed that "[i]t would be absurd to expect that an emergency room patient, with no particular sophistication about the operation and management of hospitals or medical clinics, should inquire into who is, and who is not, an employee of the institution, rather than an independent contractor." *Id*. at 211-12.

This Court affirmed the decision of the Court of Special Appeals, relying on the same reasoning. 389 Md. at 384-86.

---

[8] The Court of Special Appeals had previously reached the same conclusion in another case in the same procedural posture involving a hospital's contention that it could not be vicariously liable for negligent acts of its emergency room staff because they were independent contractors. *See Hunt v. Mercy Medical Center*, 121 Md. App. 516, 544-48 (1998) ("[T]he patient could properly assume that the doctors and staff of [the hospital] were acting on [its] behalf…. [The patient] is not necessarily bound by the limitations that may be contained in a private contract between [the hospital] and [its physicians].").

10

2.      The Restatement Provisions Relating to Apparent Agency

*Agency Restatement*

In both *Mehlman* and *Debbas*, this Court looked to §267 of the Restatement of Agency for guidance. That section provides:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Restatement (Second) of Agency, §267 ("Agency §267").[9] In a later case, the Court identified three elements to this articulation of the concept of apparent agency:

(1) Whether the apparent principal created, or acquiesced in, the appearance that an agency relationship existed.

(2) Whether the plaintiff believed that an agency relationship existed and relied on that belief in seeking the services of the apparent agent.

(3) Whether the plaintiff's belief and reliance were reasonable.

---

[9] The Restatement (Third) of Agency defines a similar concept, with similar elements, under the rubric of "apparent authority," which may be possessed by both agents and non-agents: "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.*, §2.03.

11

*Bradford*, 439 Md. at 18.[10]  At the risk of excessive alliteration, we shall refer to these elements as the *representation* element, the *reliance* element, and the *reasonableness* element.

In *Mehlman* and *Debbas*, in the context of physicians staffing a hospital emergency room, the Court looked to the nature of a hospital ("One enters a hospital for no other reason…") for the *representation* element and looked to "all appearances" and "all ordinary expectations" for the *reliance* and *reasonableness* elements.  The only question as to the *reasonableness* element was whether there was something that "put [the patient] on notice" that the emergency room staff were *not* agents of the hospital.  With respect to the latter question, the burden was on the hospital to dispel "all ordinary expectations" as it would be "absurd" to expect a patient in distress to sort out the complex and sophisticated contractual arrangements of the hospital with its emergency room staff on the way to the operating table.

*Torts Restatement*

The Restatement of Torts also sets forth a similar test for the vicarious liability of an independent contractor, although not in the same language as Agency §267:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being

---

[10] *Bradford* did not involve a patient seeking emergency care from a physician at an emergency room of a hospital.  In that case, a woman obtained care from a podiatrist who participated in the network of a managed care organization ("MCO") that financed health care services for her as a recipient of State Medicaid benefits.  The Court held that there was insufficient evidence of any manifestation by the MCO suggesting that the podiatrist worked for the health care insurer.  439 Md. at 22.  Thus, even if the patient had a subjective belief that the podiatrist was the agent of the MCO, that belief was not objectively reasonable.

12

rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

Restatement (Second) of Torts, §429 ("Torts §429"). No appellate decision in Maryland directly construes this articulation of vicarious liability. Like Agency §267, as applied in *Mehlman* and *Debbas*, Torts §429 looks to the appearance of a relationship that would result in a reasonable belief by a third party that an independent contractor was an employee ("servant" in the antiquated language of the Restatement) of the apparent principal at the time the contractor rendered services to the third party.

As we shall see in the next section of this opinion, courts in other states have looked to both of these articulations of apparent agency, sometimes in tandem, to determine whether a hospital is vicariously liable for the negligence of emergency room staff who are independent contractors rather than hospital employees.

3.      Case Law from Other Jurisdictions

In looking to Agency §267 and Torts §429 (and, in many instances, *Mehlman*) for guidance on how to decide whether a hospital is vicariously liable for negligent acts of emergency room staff as apparent agents of the hospital, courts in other jurisdictions have looked to the various factors that can be grouped according to the three elements of apparent agency:  (1) representation – the role of the hospital in creation of the appearance of an agency relationship; (2) reliance – the understanding of the patient or others that an

13

agency relationship existed; and (3) reasonableness – any effort by the hospital – and the

meaningfulness of that effort – to negate the appearance of an agency relationship.[11]

*(1) Representation – creation of the appearance of an agency relationship*

- A hospital holds itself out to the public as providing a particular service – *i.e.*, emergency services – even if the holding out is "general and implied." A hospital can provide that service only through its health care professionals (regardless of the particular employment relationship they may have with the hospital).

    *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 849, 854-55 (Wis. 1988) (citing *Mehlman* and looking to Agency §267 and Torts §429); *Clark v. Southview Hospital & Family Health Center*, 628 N.E.2d 46, 53 (Ohio 1994) (citing *Mehlman* and looking to Agency §267 and Torts §429); *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 151 (Ind. 1999) (looking to Agency §267 and Torts §429); *Hardy v. Brantley*, 471 So.2d 358, 371 (Miss. 1985) (looking to Torts §429)[12]; *Mejia v. Community Hospital*, 99 Cal.App.4th 1448, 1453-54 (Cal. Ct. App. 2002) (discussing "national trend").

*(2) Reliance – nature of the patient's understanding*

- A key factor is whether the patient looked to the hospital or the particular physician for treatment.

    *Grewe v. Mt. Clemens General Hospital*, 273 N.W.2d 429, 433 (Mich. 1978) ("the critical question is whether the plaintiff, at the time of his admission … was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him …"); *Capan v. Divine Providence Hospital*, 430 A.2d 647, 649 (Pa. Super. 1980) (looking to Torts §429 and noting "a likelihood that patients will look to the institution rather than the individual physician for care"); *Sword*, *supra*, 714

---

[11] *See* Kenneth S. Abraham & Paul C. Weiler, *Enterprise Medical Liability and the Evolution of the American Health Care System*, 108 Harv.L.Rev. 381, 386-89 & n.25 (1994) (noting that, by the mid-1990s, courts in 20 states had relied on Agency §267 and Torts §429 in addressing the issue of apparent agency in an emergency room context).

[12] The Mississippi court later indicated that the doctrine of apparent agency did not apply in a suit against a public institution in Mississippi, given the limited statutory waiver of sovereign immunity in that state. *Brown v. Delta Regional Medical Center*, 997 So.2d 195 (Miss. 2008).

N.E.2d at 151 (noting that many courts apply "a less subjective form of reliance or even to presume reliance absent any evidence that the patient knew or should have known that the physician was not an employee of the hospital").

- When a patient taken to an emergency room is unconscious or when someone other than the patient makes the decision to take the patient to an emergency room, the element of reliance can be satisfied by the decision of EMS personnel or others to take the patient to the hospital to seek care from the hospital rather than a specific physician.

  *Monti v. Silver Cross Hospital*, 637 N.E.2d 427, 430 (Ill. App. 3 Dist. 1994); *Golden v. Kishwaukee Community Health Services Center*, 645 N.E.2d 319, 321 (Ill. App. 1 Dist. 1994); *North Georgia Medical Center v. Stokes*, 517 S.E.2d 93 (Ga. App. 1999); *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255, 258 (Ky. 1985).

*(3) Reasonableness – meaningfulness of any effort to negate the appearance*

- In most cases, the various factors concerning apparent agency resolve into one issue – whether the patient had reason to know that the physician was not an agent of the hospital.

  *Mejia, supra,* 99 Cal.App.4th at 1454.

- Absent specific notice, individuals who seek treatment in emergency rooms are unlikely to know the employment or contractual status of the professionals who work there.

  *Pamperin, supra*, 423 N.W.2d at 856; *Clark, supra,* 628 N.E.2d at 53.

- Any notice that an emergency room physician is an independent contractor that is designed to allow the hospital to avoid vicarious liability must be made in a meaningful way at a meaningful time – *i.e.*, when it can be a factor in a patient's choice to obtain treatment at the hospital.

  *Sword, supra,* 714 N.E.2d at 152-53 ("meaningful" and timely notice may resolve two issues of representation and reliance, but even written notice may not suffice if the patient had an inadequate opportunity to make an informed

15

choice); *Clark, supra,* 628 N.E.2d at 54 & n.1 (informing patient after arrival at emergency room is too late to allow informed choice).[13]

- Notice provided only in a written consent form may be insufficient.

   > *Boren v. Weeks*, 251 S.W.3d 426, 437 (Tenn. 2008) (looking to Torts §429; holding that notice of physician independent contractor status in second half of a paragraph in three-page electronic consent form that was seldom explained to patients and that may not have been printed out was not sufficient basis for finding notice as a matter of law); *Simmons v. Tuomey Regional Medical Center*, 533 S.E.2d 312, 320 (S.C. 2000) (a hospital may not escape liability for emergency room doctor's negligence by giving last-minute notice of independent contractor status through admission forms or signs; looking to Torts §429 and Agency §267).

The Ohio Supreme Court synthesized the application of the common law doctrine of apparent agency in the case law (including *Mehlman*) and the restatements when a patient in distress is brought to an emergency room. It stated: "[T]he element of representation is satisfied when the hospital holds itself out to the public as a provider of medical services, and the element of reliance is satisfied if the patient looks to the hospital, rather than a specific physician, to provide [the patient] with medical care. … The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein.

---

[13] By contrast, notice has been deemed sufficient in a situation where it was prominently made in a non-emergency situation. *See Peter v. Vullo*, 758 S.E.2d 431, 439-40 (N.C. App. 2014) (consent forms for scheduled surgery that together included, in large print above patient signature line, that specific physicians were independent contractors and explicitly stated that hospital would not be liable for their action or inaction provided sufficient notice).

Indeed, often the very nature of a medical emergency precludes choice." *Clark, supra,* 628 N.E.2d at 53.

This is not an exhaustive summary of the cases in other jurisdictions, but it is a representative sample of the reasoning of the vast majority of cases dealing with the question of a hospital's vicarious liability for negligent actions or omissions of emergency room staff under the doctrine of apparent agency.[14]

## II

## Facts and Proceedings

### A.     *The Accident, the Transport, and the Treatment at the Trauma Center*

In the early morning hours of May 3, 2014, Mr. Williams was driving when he lost control of his car on the Capital Beltway and crashed.[15]  As a result, he suffered severe injuries to his legs and left arm.  An ambulance and EMS personnel were dispatched to the scene of the accident.  Mr. Williams testified at trial that he was conscious when the EMS personnel arrived at the scene and when they placed him into the ambulance.  He asked the

---

[14] A more complete collection of cases can be found in several annotations, including Annotation, *Liability of Hospital or Sanitarium for Negligence of Independent Physician or Surgeon – Exception Where Physician Has Ostensible Agency or "Agency by Estoppel,"* 64 ALR 6th 249 (originally published 2011); Annotation, *Liability of hospital or sanitarium for negligence of physician or surgeon*, 51 ALR 4th 235 (originally published 1987).

[15] On cross-examination, Mr. Williams admitted that he had been drinking "at an event" that night.  The trial court instructed the jury that the evidence that Mr. Williams had been drinking could not be considered in its assessment whether the physicians who had treated him at the Hospital were negligent.

EMS personnel to straighten out his left leg and answered background questions posed by the medics.

In accordance with the MIEMSS protocols, the EMS personnel decided to take Mr. Williams to the Hospital, which had the closest trauma center, instead of another hospital that may have been closer to the accident but that lacked a trauma center. The parties stipulated at trial that the Hospital is designated as a Level II Trauma Center by MIEMSS.

A Pre-Hospital Care Report prepared by EMS personnel during the transport of Mr. Williams was admitted as an exhibit at trial. It documented his behavior and conversations in the ambulance, noting Mr. Williams' recollection of the accident, awareness of his surroundings, and responsiveness to paramedics' questions. However, the report also noted his extreme distress, disorientation, and discomfort due to multiple severe injuries.

Mr. Williams testified that, although he was "in and out of it" and "dazed" while riding to the Hospital in the ambulance, he recalled the journey.[16] The ambulance delivered Mr. Williams to the Hospital's trauma center around 1:30 a.m. Mr. Williams testified that he "didn't have a choice" as to the physicians who would attend to him, but "relied on [] the hospital to treat [him]" with knowledge that it was a trauma center. According to a trauma assessment form prepared after his arrival at the Hospital, Mr. Williams, though verbally confused, was conscious and oriented to person, time, and place. The physician

_____

[16] Certain parts of Mr. Williams' testimony concerning what EMS personnel may have told him about the destination of the ambulance were struck as hearsay. On cross-examination, the defense impeached Mr. Williams with his pretrial deposition testimony that he had no memory of a conversation with EMS personnel, including the destination of the ambulance.

who initially encountered Mr. Williams reported that he was "repetitive" and "not making sense" and decided to intubate him "due to combativeness" at 1:52 a.m.

The Hospital apparently asked patients to sign a form that was labeled in different places as "Consent to Treatment" and "Universal Consent." The two-page form consists of approximately 25 densely worded paragraphs concerning not only the patient's consent to treatment in the Hospital, but also information about billing, authorizations to release the patient's information for various purposes, acknowledgments of receipt of various other forms, advice of certain patient rights, and other matters. The form, in what appears to be 8-point type as depicted in the record of this case, begins with the following two paragraphs:

**Consent to Treatment**

PHYSICIANS NOT AS EMPLOYEES: I acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstetrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physicians ARE NOT employees or agents of the hospital. I understand that I will receive a separate bill from each of these private providers of service.     Patient/Patient Representative Initials: ˉ X ˙

I am seeking either inpatient or outpatient service from Dimensions Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners or designee, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition. I understand I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcome of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including but not limited to anesthesiology and other interpretive and diagnostic services.

A more readable version of these paragraphs in an enlarged font may be found in Part III.B.3 of this opinion. The first paragraph of this form indicated that emergency room physicians and surgeons, among others, were not employees or agents of the Hospital. There was no evidence at trial of any other way in which the Hospital communicated that information to the public.

On the copy of the form relating to Mr. Williams' treatment on May 3, 2014, there is an "x" in the space for "Patient/Patient Representative Initials" following the first

19

paragraph. There is no indication on the form, and there was no testimony at trial, as to who made that mark, how it came to be on the form, or what it signifies. At the bottom of the second page of the form, there is a signature block, in which the space for "Signature of the Patient" is blank. A separate line for "Patient Representative Signature" contains the notation "Pt intubated unable to sign" along with the date and a signature of a "witness." There was no evidence at trial as to how those notations came to be placed on the form. Mr. Williams himself testified that he never saw the form at the emergency room.

The Hospital's designation as a Level II trauma center required that it have on call an attending board-certified or board-eligible orthopedic surgeon. Three hours after arriving at the trauma center, Mr. Williams was operated on by the on-call orthopedic surgeon – Dr. Montague Blundon. At the time, Dr. Blundon was also the Chief of Orthopedic Surgery at the Hospital and had operating privileges there. The contractual relationship of Dr. Blundon with the Hospital in his separate capacity as the on-call surgeon at the trauma center was never precisely clarified at trial, but the Hospital maintained that he was an independent contractor.

Following other surgical procedures, at approximately 4:30 a.m. Dr. Blundon performed an emergency fasciotomy on Mr. Williams to prevent further complications in his right leg.[17] Some days later, both of Mr. Williams' legs were determined to be

---

[17] Fasciotomy is a surgical procedure in which fascia, sheets of tissue that envelop the body beneath the skin, are cut to reduce swelling and restore blood flow. Stedman's Medical Dictionary at 700, 707 (28th ed. 2006). According to expert testimony at the trial, this procedure can be used to treat compartment syndrome, "a condition in which increased pressure in a confined anatomic space adversely affects the circulation and threatens the function and viability of the structures therein." *Id.* at 1894-95.

irreparably damaged and were amputated above the knees. Much of the testimony at trial concerned whether Dr. Blundon was negligent in the treatment rendered at the trauma center and in the follow-up care, and the extent of the damages that Mr. Williams suffered as a consequence.

Mr. Williams testified that, after his hospital stay, he received "a lot" of medical bills from the Hospital, but never received any bills from Dr. Blundon.

## B.    The Complaint, the Trial, the JNOV, and the Appeal

In late 2017, Mr. Williams sued the Hospital and three physicians who had treated him at the Hospital, including Dr. Blundon. The complaint alleged that the physicians had performed various procedures on Mr. Williams negligently and that they had done so "individually and/or as agents (actual and/or apparent)" of the Hospital. The Circuit Court ultimately awarded summary judgment in favor of the two other physicians in September 2019.

In October 2019, the case proceeded to trial with Dr. Blundon and the Hospital as the remaining defendants. Mr. Williams' counsel apparently dropped any contention that Dr. Blundon was an actual agent of the Hospital and proceeded on a contention that he was an apparent agent of the Hospital.[18] At the conclusion of the plaintiff's case, the Hospital moved for judgment in its favor, contending, among other things, that there was insufficient

---

[18] At oral argument, appellate counsel conceded, but could not specify precisely when, Mr. Williams dropped any contention that Dr. Blundon was an actual agent of the Hospital. It is evident from the Plaintiff's written pretrial statement, filed the month before trial, that by that time Mr. Williams was proceeding on the theory that Dr. Blundon was the apparent agent of the Hospital.

evidence for the jury to find that Dr. Blundon was the Hospital's apparent agent. The trial court briefly reviewed Maryland case law on apparent agency, as well as several out-of-state cases concerning application of the doctrine in emergency room settings that Mr. Williams' counsel had cited. The court reserved judgment on the motion. At the conclusion of all of the evidence, the Hospital renewed its motion for judgment, and the trial court again reserved judgment on the motion.

The next morning, as part of its instructions to the jury, the trial judge explained the doctrine of apparent agency:

> Dr. Blundon is alleged to be an apparent agent of the hospital defendant. Hospitals are engaged in the business of providing health care services. A hospital is responsible to its patients when the hospital leads a patient to believe that another is an agent and the patient reasonably relies upon the agency.
>
>        \*        \*        \*        \*        \*
>
> Under the doctrine of apparent agency, a hospital may be found liable for the negligence of its apparent agent – in this case, Dr. Blundon – if, one, the hospital makes representations that create the appearance of an employment or agency relationship; two, the plaintiff believes that an employment or agency relationship exists and relies on that belief to the patient's detriment; and three, the plaintiff's belief is reasonable under the circumstances.

A few hours later, the jury returned a verdict finding that: (1) Dr. Blundon had breached the standard of care when treating Mr. Williams; (2) Dr. Blundon's negligence was the cause of Mr. Williams' damages; and (3) Dr. Blundon was an agent of the

22

Hospital.[19]   The jury awarded damages to Mr. Williams, and the trial court entered judgment in the amount of $6,137,049 in favor of Mr. Williams.[20]

Following the jury's verdict, the Hospital moved for judgment notwithstanding the verdict ("JNOV") under Maryland Rule 2-532.  On January 29, 2020, the trial court held a hearing on the motion.  Counsel for both parties again argued about the application of Maryland precedent on apparent agency and Mr. Williams' counsel again cited the same three out-of-state cases concerning application of the apparent agency doctrine in the context of an emergency room that he had mentioned in the earlier arguments.[21]   The trial court reserved judgment at the hearing to review the cases raised by counsel.  However, it expressed skepticism that the evidence was sufficient to support the verdict, noting that there was "no evidence" that Mr. Williams "ever perceived the hospital held out or represented that Dr. Blundon was an agent … [or] … that Mr. Williams knew of any relationship between Dr. Blundon and the hospital … [or] … that Mr. Williams knew of the existence of Dr. Blundon."  In February 2020, the court issued a two-page written order

---

[19] The verdict form states that the jury found that Dr. Blundon was "an agent" of the Hospital, without specifying whether he was an actual or apparent agent.  However, as the jury was instructed only on the theory of apparent agency, like the parties, we infer that this was a finding of apparent agency.

[20] The jury's verdict had found damages in a total amount of $6,285,549, but the parties agreed that a clerical error in the verdict required that the judgment be in the lesser amount of $6,137,049.

[21] Those cases were the *Golden* and *Monti* cases from Illinois and the *Pamperin* case from Wisconsin, which are among the cases described in Part I.C.3 of this opinion above.  Other out-of-state cases were cited in written filings by Mr. Williams' counsel.

granting the Hospital's motion for JNOV, indicating briefly that there were no "sufficiently analogous" cases in Maryland to support the jury's finding of apparent agency.

Mr. Williams appealed the JNOV, and the Hospital filed a conditional cross-appeal on the ground that the damages awarded to Mr. Williams were excessive.[22] In an unreported opinion, the Court of Special Appeals agreed with the Circuit Court, concluding there was insufficient evidence from which a reasonable jury could find that Mr. Williams specifically believed that Dr. Blundon was the Hospital's agent. *Williams v. Dimensions Health Corp.*, No. 0036, Sept. Term 2020, 2021 WL 3052830 at *4 (Md. Ct. Spec. App. July 20, 2021). The intermediate appellate court acknowledged that a patient does not have a duty to inquire into the precise relationship that a physician has with a hospital. *Id*. at *7. However, it held that the evidence was insufficient to establish that Mr. Williams had a "subjective belief" that Dr. Blundon was an agent or employee of the Hospital. *Id*. at *7-9. The court did not address the Hospital's cross-appeal.

Mr. Williams filed a petition for a writ of *certiorari* on the issue of the nature of the evidence required to establish apparent agency. The Hospital filed a conditional cross-petition on the same issue as its cross-appeal that the intermediate appellate court had not addressed. We granted Mr. Williams' petition, but declined to grant the Hospital's cross-petition. In light of our decision to reverse the judgment of the Court of Special Appeals, we shall remand the case to that court for it to consider the Hospital's cross-appeal in the first instance.

---

[22] Dr. Blundon sought, and lost, a motion for JNOV concerning the verdict against him. He did not appeal that decision.

24

## III

## Discussion

### A. *Standard of Review*

Whether a trial court properly granted a motion for JNOV is a legal question, for which an appellate court applies the same standard as the trial court. Under that standard, a grant of JNOV must be reversed if there was any evidence, however slight, that, when viewed in the light most favorable to the nonmoving party, would support a verdict by a reasonable jury in that party's favor. *See Town of Riverdale Park v. Ashkar*, 474 Md. 581, 607-08 (2021); *Cooper v. Rodriguez*, 443 Md. 680, 706 (2015).

### B. *Whether There was Sufficient Evidence to Support the Jury's Verdict*

As recounted earlier, the jury in this case found specifically that (1) Dr. Blundon was negligent in his treatment of Mr. Williams at the Hospital's trauma center; (2) Dr. Blundon's negligence caused Mr. Williams' damages; and (3) Dr. Blundon was an agent of the Hospital at the time of that negligent treatment. The jury also itemized the damages on the verdict form. There is no dispute before us that there was sufficient evidence as to the first two parts of the verdict. The itemization and assessment of damages is also not before us. The only question for us to decide is whether there was sufficient evidence, "however slight" and viewed in the light most favorable to Mr. Williams, for the jury to find that Dr. Blundon was the apparent agent of the hospital. As explained earlier, we assess the evidence as to three elements – representation, reliance, and reasonableness.

25

1. Representation

With respect to this element, the Hospital had an emergency room that held out that it offered treatment for patients in emergency circumstances. Moreover, the Hospital had obtained a designation by MIEMSS as a Level II trauma center, thus representing publicly, in accordance with that designation and as stipulated at trial, that it would have an orthopedic surgeon available to treat those in need of such services. Dr. Blundon was the surgeon who fulfilled the Hospital's obligation in that respect. In that way, the Hospital held out and at least created the impression that Dr. Blundon was its agent in providing those services to patients brought to its trauma center.

No specific evidence was presented by the Hospital at trial as to the precise contractual relationship between it and Dr. Blundon. But the implicit representation that Dr. Blundon was its agent in providing the required orthopedic surgery services was reinforced by the fact, also introduced at trial, that he was Chief of Orthopedic Surgery at the Hospital at the time he treated Mr. Williams.

In sum, there was sufficient evidence, viewed in the light most favorable to Mr. Williams for the jury to find this element satisfied. The Hospital does not appear to seriously dispute that conclusion.

2. Reliance

The Hospital asserts that the burden is on a patient such as Mr. Williams to establish that the patient specifically believes at the time he is in a hospital's emergency room that

the treating physician is the hospital's agent.[23] The Hospital concedes that there was no requirement for direct testimony from Mr. Williams concerning the reliance element.[24] However, the Hospital asserts that the record is devoid of evidence that, under the circumstances, Mr. Williams would have – or could have – made any choice about receiving treatment from Dr. Blundon based on the doctor's employment status. The Hospital argues that no reasonable jury could have concluded that Mr. Williams both believed that Dr. Blundon was the Hospital's agent and relied on that belief. Thus, the Hospital argues, Mr. Williams did not satisfy the reliance element of apparent agency.

The Hospital's argument overlooks the context in which medical services were provided in this case. In most instances in which a patient in acute distress – or one acting in the patient's interest – seeks emergency medical assistance, that person looks to the hospital or emergency facility rather than to a specific health care provider. In other words, the patient, or the person acting for the patient, relies on the facility's representation that its personnel will provide the required treatment as that person has no time to either choose among individual physicians or make fine distinctions on their precise contractual relationship with the facility.

---

[23] As a corollary, the Hospital asserts that it could never be vicariously liable to an unconscious patient brought to an emergency room because such a patient would not have the requisite specific knowledge that, in the Hospital's view, is required to establish an apparent agency relationship.

[24] The Hospital also concedes that there was no requirement for direct testimony by Mr. Williams of a subjective belief that Dr. Blundon was the Hospital's agent. Circumstantial evidence of reliance satisfied the element of reliance in *Mehlman* and *Debbas* where, in both cases, the patients had died shortly after visiting the emergency room and obviously were unavailable to testify at trial.

27

Such was the case here when the EMS personnel, in accordance with MIEMSS protocols, transported Mr. Williams to the Hospital, instead of another hospital closer to the accident, because of the Hospital's designation as a Level II trauma center. As noted above, that designation is to ensure "that the patient get[s] to the right facility to receive the right care." Mr. Williams testified that he knew at the time that he was at the Hospital, that he was aware that it was a trauma center, and that he relied on the Hospital to treat him.[25] There was sufficient evidence at trial, viewed in the light most favorable to Mr. Williams, that he, and the EMS personnel attending to him, relied on the representation of the Hospital that it would provide the requisite medical staff to treat Mr. Williams' injuries on an emergency basis.

Nothing in the record suggests any prior relationship between Mr. Williams and Dr. Blundon or the other providers who treated him. This was an occasion where the patient, and those acting in his interest, chose the Hospital, not Dr. Blundon or any other provider, to provide necessary treatment. In sum, there was sufficient evidence for the jury to conclude that that the reliance element was satisfied.

3.      Reasonableness

As noted above, in cases involving patients in distress brought to emergency rooms, the reasonableness element in the application of the apparent agency doctrine often

---

[25] It is true, as the Hospital points out, that it cross-examined Mr. Williams at trial about his apparently contradictory deposition testimony a year before the trial that he could not remember what transpired during the trip to the Hospital. However, it was the jury's prerogative, not that of a court addressing a motion for JNOV, to determine the extent to which that cross-examination undermined his testimony on direct examination.

involves a discussion whether the hospital gave meaningful notice that emergency room staff were independent contractors and whether such notice could ever be meaningful in that context.

According to the Hospital, the Hospital uses a consent form to notify arriving patients that the Hospital does not consider the physicians and surgeons providing emergency care to be its employees or agents.[26] In particular, in its brief to us, the Hospital points to its Consent to Treatment form as "constructive notice" with "clear statements" that Dr. Blundon was not its agent.

That two-page small-print form ranges over a variety of topics. The first two paragraphs address, in part, the relationship of the Hospital to those who provide treatment on its premises and on its behalf. Those two paragraphs, enlarged from the original for the sake of legibility, read as follows:

**Consent to Treatment**

PHYSICIANS NOT AS EMPLOYEES: I acknowledge that physicians furnishing services, including but not limited to attending physicians, radiologists, surgeons, emergency department physicians, obstetrician/gynecologists, pathologists, anesthesiologists, neonatologists, physicians interpreting diagnostic studies, consultants and assistants to the physicians ARE NOT employees or agents of the hospital. I understand that I will receive a separate bill from each of these private providers of service.           Patient/Patient Representative Initials ____

I am seeking either impatient or outpatient service from Dimension Healthcare System (DHS). I understand services are available to me without discrimination as prohibited by federal and state law. I hereby consent to care and treatment, including

---

[26] There was no evidence at trial of any signs or other information at the trauma center informing anyone that the Hospital was not responsible for the treatment provided there, even if such signage would be significant. In any event, as one of the medics who transported Mr. Williams testified, "my concern is not with signs on the wall," but rather with getting the patient to the right facility for emergency treatment.

but not limited to diagnostic medical therapeutic testing and treatment as may be deemed necessary or advisable by my physician, his/her associates, partners or designee, consulting physicians, DHS and its employees, based on his/her medical knowledge and my health condition, I understand that I have a right to limit or refuse recommended treatments and/or procedures. I understand that no guarantees have been made to me about the outcomes of this care. I understand that health related services may be provided by the employees, agents, and independent contractors utilized by DHS, including by not limited to anesthesiology and other interpretive and diagnostic services.

Even in legible form, these two paragraphs are hardly models of clarity. The first paragraph, while asserting that various health care providers at the Hospital are <u>not</u> employees or agents, appears to be about billing and seeks an acknowledgment that the patient will receive multiple bills. A lay reader would be unlikely to understand that it was a disclaimer by the Hospital of responsibility for the actions of those who staffed its departments.

The second paragraph appears to address patient rights – non-discrimination, consent to treatment – and to disclaim any guarantee of a particular outcome. It does not disclaim the Hospital's responsibility for treatment. Indeed, the last sentence of the second paragraph seems to contradict the first paragraph, at least in part, in stating that the health care services received by the patient will be provided by "employees, agents, and independent contractors utilized by [the Hospital]" without advising a lay reader as to the significance of those distinctions for the Hospital's responsibility. It also suggests control by the Hospital over the providers, which supports the appearance of an agency relationship between the Hospital and its providers – whichever category those providers belong to.

30

In any event, Mr. Williams did not sign the form, and there was no evidence that he ever saw it.[27] As the trial court opined, the relevance of this consent form to the question of apparent agency was "marginal to none."

Finally, the Hospital argues that applying the doctrine of apparent agency, as applied in *Mehlman* and the many cases concerning emergency rooms in other states that cite *Mehlman* and Agency §267, would "impose strict liability" on hospitals for treatment provided by physicians who are independent contractors. This is incorrect; application of the doctrine of apparent agency does not result in strict liability. As a threshold matter, the emergency room physician must have been negligent before any vicarious liability can attach. For example, in this case, the Hospital would not have been vicariously liable if the jury had answered "no" to either of the first two questions on the verdict sheet – whether Dr. Blundon was negligent and whether that negligence caused Mr. Williams damages – even if the evidence supported a finding that Dr. Blundon was an apparent agent of the Hospital.[28]

---

[27] Moreover, as Mr. Williams testified, while he received many bills from the Hospital, he never received a separate bill from Dr. Blundon – which seemed to be the main information that the first paragraph of the form conveyed as to personnel who were not agents or employees of the Hospital.

[28] In arguing that out-of-state cases concerning apparent agency in an emergency room setting portend "strict liability" for hospitals, the Hospital cited only an Alaska case based on the doctrine of non-delegable duty. The Hospital did not address the many cases referenced earlier concerning apparent agency based on Agency §267 and Torts §429.

# IV

## Conclusion

For the reasons set forth above, there was sufficient evidence at trial for a reasonable jury find that Dr. Blundon was at least the apparent agent of the Hospital at the time he treated Mr. Williams at the Hospital's trauma center.  Accordingly, there was sufficient evidence to find the Hospital vicariously liable for the surgeon's negligence.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED.  CASE REMANDED TO THAT COURT TO CONSIDER RESPONDENT'S CROSS-APPEAL.  COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Prince George's County
Case No. CAL 17-35481
Argued: March 8, 2022

TERENCE WILLIAMS

v.

DIMENSIONS HEALTH CORPORATION

\*Getty, C.J.
Watts,
Hotten,
Biran,
Gould,
Raker, Irma S.,
  (Senior Judge, Specially Assigned)
McDonald, Robert N.,
  (Senior Judge, Specially Assigned)

JJ.

Dissenting Opinion by Getty, C.J., which Biran, J. joins.

Filed: July 28, 2022

\*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Respectfully, I dissent. While the Majority provides a comprehensive summary and explanation of the doctrine of apparent agency in Maryland, I diverge with the Majority's apparent revision of the requisite subjective belief necessary to establish an apparent agency relationship and conclusion that "there was sufficient evidence for the jury to conclude that the reliance element was satisfied." Majority Slip Op. at 26–28. Instead, I agree with the opinion of the Court of Special Appeals that "the evidence was insufficient for a reasonable jury to find that [Terence Williams ("Mr. Williams")] actually entertained a belief that an agency or employee relationship existed[]" between Montague Blundon, M.D. ("Dr. Blundon") and Dimensions Health Corporation d/b/a Prince George's Hospital Center ("Hospital"). *Terence Williams v. Dimensions Health Corp.*, No. 36, slip op. at 18 (Md. Ct. Spec. App. July 20, 2021). Accordingly, I would affirm the judgment of the Court of Special Appeals.

## A. *The Elements of the Doctrine of Apparent Agency*

Generally, "one who engages an independent contractor is not vicariously liable for the negligence of the contractor." *Bradford v. Jai Med. Sys. Managed Care Orgs., Inc.*, 439 Md. 2, 16 (2014) (citing *Rowley v. Mayor & City Council of Balt.*, 305 Md. 456, 461–62 (1986)). It is well-settled that the doctrine of apparent agency is an exception to this general concept "whereby a principal is held responsible for the acts of another because the principal, by its words or conduct, has represented that an agency relationship existed between the apparent principal and its apparent agent." *Id.*; *see also Debbas v. Nelson*, 389 Md. 364, 385 (2005); *Mehlman v. Powell*, 281 Md. 269, 273 (1977) (quoting *B.P. Oil Corp. v. Mabe*, 279 Md. 632, 643 (1977)).

As the Majority accurately states, this Court has set forth that three elements must be satisfied to establish an apparent agency relationship, namely:

1. Did the apparent principal create, or acquiesce in, the appearance that an agency relationship existed?

2. Did the plaintiff believe that an agency relationship existed and rely on that belief in seeking the services of the apparent agent?

3. Were the plaintiff's belief and reliance reasonable?

*Bradford*, 439 Md. at 18 (citing *Chevron U.S.A., Inc. v. Lesch*, 319 Md. 25, 34–35 (1990)). The Majority refers to these elements "as the *representation* element, the *reliance* element, and the *reasonableness* element." Majority Slip Op. at 12. (Emphasis in original).

For a plaintiff to successfully establish the reliance element in an apparent agency claim against an emergency facility, hospital, or medical provider, "a plaintiff must show that the plaintiff subjectively believed that an employment or agency relationship existed between the apparent principal and the apparent agent, and that the plaintiff relied on that belief in seeking medical care from the apparent agent." *Bradford*, 439 Md. at 18–19. The Majority notably cites to this requisite subjective belief in its summary of Maryland apparent agency caselaw. Majority Slip Op. at 11–12 (citing *Bradford*, 439 Md. at 18).

However, in its analysis of the reliance element, the Majority amends this standard for the first time in our jurisprudence to allow for someone acting *in the patient's interest* that "relies on the [emergency] facility's representation that its personnel will provide the required treatment" to satisfy this subjective element. Majority Slip Op. at 27. Contrary to this Court's precedent, the Majority changes the standard of what satisfies the subjective

2

belief requirement of the reliance element. Notably, the Majority does not cite any authority in support of this new standard that encompasses a third party.

**B.      *Insufficient Evidence in the Record to Establish the Necessary Subjective Belief for Apparent Agency Claim***

To establish the reliance element the Majority relies, almost entirely, on the Hospital's designation as a Level II trauma center. Majority Slip Op. at 28. The Majority emphasizes that "Mr. Williams testified that he knew at the time he was at the Hospital, that he was aware that it was a trauma center, and that he relied on the Hospital to treat him[,]" in attempting to establish the reliance element. *Id.* Yet, this evidence is inadequate to establish the requisite subjective belief necessary for the reliance element in accordance with the standard this Court articulated in *Bradford.* 439 Md. at 18–19.

As the intermediate appellate court accurately observed below, "[t]here was no direct testimony from Mr. Williams that he believed Dr. Blundon or, more generally, the physicians or staff at the Hospital were its agents or employees." *Williams*, No. 36, slip op. at 18.   Mr. Williams did testify at trial that he (1) did not know Dr. Blundon; (2) was never introduced to Dr. Blundon; and (3) did not have a choice as to his treating physician:

> [MR. WILLIAMS]: I rode to the hospital, and I was in and out of it.  I was dazed.  I was in and out of it.
>
> A lot of commotion was going on in the hospital.  I'm laying there.  Some people tending to me.  Some people not.  Mostly it was like -- from what I know about the medical field now, me being in a facility, it was mostly nurses and P[hysicians] A[ssistants] taking care of me.
>
> *      *      *
>
> [COUNSEL FOR MR. WILLIAMS]: And did you know an individual by the name of Dr. Montague Blundon?

3

[MR. WILLIAMS]: No.

[COUNSEL FOR MR. WILLIAMS]: Okay. Had you seen him before?

[MR. WILLIAMS]: No.

[COUNSEL FOR MR. WILLIAMS]: Do you know how Dr. Blundon became your doctor?

[MR. WILLIAMS]: No.

[COUNSEL FOR MR. WILLIAMS]: Did you choose Dr. Blundon?

[MR. WILLIAMS]: No.

[COUNSEL FOR MR. WILLIAMS]: Who did you choose to treat you?

[MR. WILLIAMS]: I didn't have a choice. All I relied on was the hospital to treat me.

[COUNSEL FOR MR. WILLIAMS]: All right. And had you ever spoken to Dr. Blundon?

[MR. WILLIAMS]: No.

[COUNSEL FOR MR. WILLIAMS]: You say you didn't have a choice. Did you object to the hospital treating you?

[MR. WILLIAMS]: No.

Additionally, Mr. Williams testified on cross-examination to excerpts of his prior deposition testimony. Mr. Williams' deposition testimony sets forth that at the time he was transported to the Hospital he did not have a conversation about which medical facility he would be taken to, nor did he know which medical facility was nearest to him at the time of the accident:

4

[COUNSEL FOR HOSPITAL]: You were asked this question [at your deposition]: "Do you have any memory of speaking to any of the E[mergency] M[edical] S[ervices] personnel or the police?"

And your answer was "No."

Question, "Do you remember speaking to any of the other witnesses to the accident?"

Your answer was "No."

Question, "Is there anything else that you recall from the scene of the accident, from the time that you felt this bump to the time that you remember waking up in the hospital? Is there anything else that you remember?"

"No."

Question, "Do you remember having any conversation about what hospital you would go to?"

"No."

"Do you know what hospital you were near?"

"No."

Did I read that correctly?

[MR. WILLIAMS]: You read it correctly.

Additionally, counsel for the Hospital further questioned Mr. Williams regarding his deposition testimony, which established that Mr. Williams was not aware he was in the Hospital until well after Dr. Blundon performed the operation:

[COUNSEL FOR HOSPITAL]: Question, "Did you even know what hospital you were in?"

Your answer was "No."

"When was the first time you became aware of what hospital you were in?"

5

Your answer was, "When I was in Baltimore, when I . . . woke up, out of the coma, I realized where I was at, because they introduced theirselves and they spoke to me and they told me what happened."

Question, "So you have no recollection of essentially even being at Prince George's Hospital?"

Answer, "Just waking up, seeing people, and falling out. I woke up, saw people I recognized, passed back out. I woke up, saw different people, passed back out. I woke up -- you know, it was just like that the whole time, the whole time."

Do you -- next question, "Do you remember anyone speaking to you while you were at Prince George's Hospital about any operation that you had had?"

"No."

Did I read your testimony correctly?

[MR. WILLIAMS]: Yeah.

Viewing the record in the light most favorable to Mr. Williams, a reasonable jury could not infer from Mr. Williams' testimony that Mr. Williams had a subjective belief that an agency relationship existed between Dr. Blundon and the Hospital. Nor could a reasonable jury find that Mr. Williams relied on that belief in seeking the medical services of the Hospital or Dr. Blundon.

## C. *Future Implications of the Majority's Holding*

The Majority's holding changes the apparent agency analysis in the context of hospitals, emergency facilities, and medical providers. The Majority broadens that which satisfies the requisite subjective belief to establish the reliance element. This new approach to the apparent agency relationship is one step short of establishing a strict liability standard. Under settled Maryland law, an entity may not be held liable as an apparent

6

principal where the plaintiff has not detrimentally relied on the apparent principal's misrepresentations of agency in seeking the apparent agent's services. *See Bradford*, 439 Md. at 18–19; *Debbas*, 389 Md. at 385; *Mehlman*, 281 Md. at 273 (quoting *B.P. Oil Corp.*, 279 Md. at 643). However, here, the Majority holds the Hospital vicariously liable for the negligent acts of an independent contractor simply because the Hospital is a designated Level II trauma center and the responding Emergency Medical Services ("EMS") personnel relied on this designation in selecting the Hospital to treat Mr. Williams.

The Majority does not account for the actual knowledge of the EMS personnel in its analysis and holding. Hypothetically, EMS personnel spend a significant amount of time in emergency facilities and hospitals, as well as interacting with the medical providers working in these emergency facilities and hospitals. As such, EMS personnel are likely to have actual knowledge that many of the medical providers working in emergency facilities and hospitals are independent contractors and not employees. Under the Majority's analysis, the actual knowledge of EMS personnel as to the status of a treating medical provider is irrelevant. An emergency facility or hospital can be held liable for the negligent actions of an independent contractor, as long as the EMS personnel relied on the emergency facility's or hospital's State designation in choosing that particular emergency facility or hospital to treat its patient.

Under the broadened standard of what satisfies the requisite subjective belief to establish the reliance element, it is unclear what actions a medical provider, emergency facility, or hospital could take to shield itself from vicarious liability in circumstances where a patient is in distress and transported to the facility by a third party, such as EMS

7

personnel. Here, the Majority's analysis creates a strict liability scenario, which is not supported by this Court's established precedent and is nearly impossible for medical providers, emergency facilities and hospitals to overcome. No other Maryland entity, such as businesses, schools, and religious organizations, is subject to this approach to apparent agency liability.

Because I disagree with the Majority's blurring of the standard for what is required to satisfy the requisite subjective belief of the reliance element and its conclusion that "there was sufficient evidence for the jury to conclude that the reliance element was satisfied[,]" I respectfully dissent. Therefore, I would affirm the judgment of the Court of Special Appeals.

Judge Biran has authorized me to state that he joins this opinion.